ACCEPTED
03-14-00774-CV
5993560
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/9/2015 10:29:38 AM
JEFFREY D. KYLE
CLERK

No. 03-14-00774-CV

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/9/2015 10:29:38 AM
JEFFREY D. KYLE
Clerk

ELLEN JEFFERSON, D.V.M.

*Appellant*,

v.

TEXAS STATE BOARD OF VETERINARY MEDICAL EXAMINERS
AND NICOLE ORIA, IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR

*Appellees*.

_____

On Appeal from the 250th Judicial District Court
of Travis County, Texas

_____

**BRIEF OF APPELLANT ELLEN JEFFERSON, D.V.M.**

_____

DAVID F. BROWN
State Bar No. 03108700
dbrown@ebblaw.com
DAVID P. BLANKE
State Bar No. 02453600
dblanke@ebblaw.com
EWELL, BROWN & BLANKE, LLP
111 Congress Ave., 28th Floor
Austin, TX 78701
Ph: (512) 457-0233

RYAN CLINTON
State Bar No. 24027934
rdclinton@dgclaw.com
DAVIS, GERALD & CREMER, P.C.
111 Congress Ave., Suite 1660
Austin, Texas 78701
Ph: (512) 537-9938
Fax: (432) 687-1735

Counsel for Appellant Ellen Jefferson, D.V.M.

Oral Argument Requested

# IDENTITY OF PARTIES

**Appellant/Plaintiff:**

Ellen Jefferson, D.V.M. ("Dr. Jefferson")

**Counsel for Dr. Jefferson:**

*Trial & Appellate Counsel*:

David F. Brown
State Bar No.  03108700
dbrown@ebblaw.com
David P. Blanke
State Bar No. 02453600
dblanke@ebblaw.com
Ewell, Brown & Blanke, LLP
111 Congress Ave., 28th Floor
Austin, TX 78701
Ph: (512) 457-0233

*Appellate Counsel*:

Ryan Clinton
State Bar No. 24027934
rdclinton@dgclaw.com
Davis, Gerald & Cremer, P.C.
111 Congress Ave., Suite 1660
Austin, Texas 78701
Ph: (512) 537-9938
Fax: (432) 687-1735

**Appellees/Defendants:**

Texas State Board of Veterinary Medical Examiners ("TBVME") and Nicole Oria, In Her Official Capacity as Executive Director

**Counsel for Defendants:**

Andrew Lutostanski
State Bar No. 24072217
andrew.lutostanski@texasattorneygeneral.gov
Ted A. Ross
State Bar No. 24008890
ted.ross@texasattorneygeneral.gov
Office of the Attorney General of Texas
Administrative Law Division
P. O. Box 12548
Austin, TX 78711
(512) 475-4200

# TABLE OF CONTENTS

Identity of Parties ........................................................................................... ii

Table of Authorities ....................................................................................... vii

Statement of the Case ..................................................................................... xiii

Statement Regarding Oral Argument ............................................................. xv

Issues Presented ............................................................................................. xvi

Introduction ...................................................................................................... 1

Statement of Facts ........................................................................................... 4

Summary of the Argument ............................................................................. 19

Argument ........................................................................................................ 21

I.  The Trial Court Erred by Dismissing Dr. Jefferson's Uniform
    Declaratory Judgment Act Claims for Failure to First Exhaust
    Administrative Remedies Because—As a Matter of Law—the
    Doctrine Does Not Apply. ................................................................. 21

    A. The Baseline Rules:  Texas District Courts Have Subject-Matter
       Jurisdiction Unless It Is Expressly Taken Away, and Texas
       Governmental Agencies Have No Jurisdiction Unless It Is
       Expressly Given ......................................................................... 22

    B. Dr. Jefferson Was Not Required to Exhaust Administrative
       Remedies Because the Legislature Did Not Confer Upon the
       TBVME Exclusive Jurisdiction Over the Treatment of Animals
       by Their Owners; And Regardless, Several Exceptions to the
       Exhaustion Doctrine Apply Here. ............................................... 23

       1. The Legislature did not confer upon the TBVME exclusive
          jurisdiction over the care and treatment of animals by their
          owners, owners' employees, or designated caretakers. ...................... 24

2. Even if the Legislature had granted the TBVME exclusive jurisdiction over conduct covered by the "owner exemption," several exceptions to the exhaustion-of-remedies doctrine apply to retain the trial court's jurisdiction over Dr. Jefferson's UDJA claims. ...............................................................30

    a. The exhaustion doctrine does not divest a district court of jurisdiction to adjudicate claims alleging that a governmental agency is acting outside its authority. ...........................................31

    b. The exhaustion doctrine does not divest a district court of jurisdiction if forcing a plaintiff to first exhaust administrative remedies would subject the plaintiff to irreparable harm. .............33

    c. The exhaustion doctrine does not divest a district court of jurisdiction to determine legal questions .......................................36

    d. The exhaustion doctrine does not require a plaintiff to participate in an "exercise in futility." ...........................................37

C. The Trial Court's Dismissal of Dr. Jefferson's UDJA Claims Is Also Not Justified on the Unreached Grounds Presented in Defendants' Plea to the Jurisdiction........................................................................................40

II. The Trial Court Should Have Declared—and This Court Should Declare— That the Board's Prosecution of Dr. Jefferson for Her Treatment and Care of Animals Owned by San Antonio Pets Alive Is Ultra Vires and Unlawful. ..44

A. Dr. Jefferson's Care and Treatment of San Antonio Pets Alive's Animals Was "By the Owner of the Animal, an Employee of the Owner, or a Designated Caretaker of the Animal." ...................................................45

B. Dr. Jefferson Established San Antonio Pets Alive with the Intent to Save Animals' Lives—Not to Violate a Law. .................................................50

III. The Trial Court Also Erred by Denying Dr. Jefferson's Request for Mandamus Relief........................................................................................53

IV. The Trial Court Erred by Issuing Unrequested, Ambiguous, and Legally Incorrect Declarations................................................................................57

v

Prayer ........................................................................................................60

Certificate of Service ...............................................................................62

Certificate of Compliance ........................................................................63

## APPENDIX

Exhibit A -  Trial Court Judgment (1.CR.855-57)

Exhibit B -  Findings of Fact and Conclusions of Law (2.C.R. 36-38)

Exhibit C -  Owner Exemption to Veterinary Licensing Act
             (TEX. OCC. CODE 801.0004)

Exhibit D -  TBVME 2012 "Board Notes" (3.RR.PX18:EJ000638)

Exhibit E -  SOAH Order

**CASES**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967), *abrogated on other grounds in Califano v. Sanders*, 430 U.S. 99 (1977) ........................................................ 41, 42

*Appraisal Review Bd. of Harris Cnty. Appraisal Dist. v. O'Connor & Assocs.*,
  267 S.W.3d 413 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ..................... 32

*BCY Water Supply Corp. v. Residential Inv. Inc.*,
  170 S.W.3d 596 (Tex. App.—Tyler 2005, pet. denied) ..................................... 26

*Butnaru v. Ford Motor Co.*,
  84 S.W.3d 198 (Tex. 2002) ..................................................................... 26

*Cash Am. Int'l Inc. v. Bennett*,
  35 S.W.3d 12 (Tex. 2000) ................................................................. 25, 26

*City of Hous. v. Williams*,
  99 S.W.3d 709 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ....................... 34

*City of Round Rock v. Whiteaker*,
  241 S.W.3d 609 (Tex. App.—Austin 2007, pet. denied) ............ 22, 23, 26, 54, 59

*City of Sherman v. Pub. Util. Comm'n of Tex.*,
  643 S.W.2d 681 (Tex. 1983) ................................................................. 24, 29

*Cobb v. Harrington*,
  144 Tex. 360, 190 S.W.2d 709 (1945) ......................................................... 54

*Dir. of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*,
  600 S.W.2d 264 (Tex. 1980) ....................................................................... 54

*Dow Chem. v. Francis*,
  46 S.W.3d 237 (Tex. 2001) ....................................................................... 44

*Dubai Petroleum Co. v. Kazi*,
  12 S.W.3d 71 (Tex. 2000) ..................................................................... 22, 23

*Fed. Sign v. Tex. S. Univ.*,
   951 S.W.2d 401 (Tex. 1997) ...............................................................54

*Forest Oil Corp. v. El Rucio Land & Cattle Co.*,
   446 S.W.3d 58 (Tex. App.—Houston [1st Dist.] 2014, pet. filed) .....................27

*Fort Worth Elevators Co. v. Russell*,
   123 Tex. 128, 70 S.W.2d 397 (1934) .................................................... 46, 47, 48

*Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth.*,
   96 S.W.3d 519 (Tex. App.—Austin 2002, pet. denied)........................ 32, 36, 46

*G&H Towing Co. v. Magee*,
   347 S.W.3d 293 (Tex. 2011) ...............................................................58

*Gen. Exch. Ins. Corp. v. Appling*,
   144 S.W.2d 699 (Tex. Civ. App.—El Paso 1940, no writ).......................... 58, 59

*Hamilton v. Washington*,
   No. 03-11-00594-CV, 2014 WL 7458988 (Tex. App.—Austin Dec. 23, 2014, no
   pet.) (mem. op.) ...............................................................................56

*Hammerly Oaks, Inc. v. Edwards*,
   958 S.W.2d 387 (Tex. 1997) ............................................................... 46, 47

*Hexter Title & Abstract Co., Inc. v. Grievance Comm., Fifth Cong. Dist., State Bar
   of Tex.*,
   142 Tex. 506, 179 S.W.2d 946 (Tex. 1944).......................................................46

*Holloway v. Skinner*,
   898 S.W.2d 793 (Tex. 1995) ...............................................................46

*Hous. Fed'n of Teachers, Local 2415 v. Hous. Indep. Sch. Dist.*,
   730 S.W.2d 644 (Tex. 1987) .............................................................. 33, 34, 36

*Hous. Indep. Sch. Dist. v. Rose*,
   No. 01-13-00018-CV, 2013 WL 3354724 (Tex. App.—Houston [1st Dist.] July
   2, 2013, no pet.) (mem. op.) ......................................................... 37, 38

*In re McAllen Med. Ctr, Inc.*,
   275 S.W.3d 458 (Tex. 2008) (orig. proceeding) ..............................................55

*In re Prudential Ins. Co. of Am.*,
148 S.W.3d 124 (Tex. 2004) (orig. proceeding) ....................................................55

*In re Vesta Ins. Grp., Inc.*,
192 S.W.3d 759 (Tex. 2006) ........................................................................46

*Janek v. Harlingen Family Dentistry, P.C.*,
451 S.W.3d 97 (Tex. App.—Austin 2014, no pet.)...................................... 56, 57

*Larry Koch, Inc. v. Tex. Natural Res. Conservation Comm'n*,
52 S.W.3d 833 (Tex. App.—Austin 2001, pet. denied).............................. 32, 33

*Mag-T, L.P. v. Travis Cent. Appraisal Dist.*,
161 S.W.3d 617 (Tex. App.—Austin 2005, pet. denied)........................ 32, 34, 36

*Mitz v. Tex. State Bd. of Veterinary Med. Exam'rs*,
278 S.W.3d 17 (Tex. App.—Austin 2008, pet. dism'd) .............................. 41, 42

*Mobil Oil Corp. v. Ellender*,
968 S.W.2d 917 (Tex. 1998) ........................................................................49

*Onoray Davis Truck Co. v. Ford Motor Credit Co.*,
690 S.W.2d 40 (Tex. App.—Houston [14th Dist.] 1985, no writ)......................58

*Perry v. Del Rio*,
66 S.W.3d 239 (Tex. 2001) ........................................................................41

*R.R. Comm'n of Tex. v. CenterPoint Energy Res. Corp.*,
No. 03-13-00533-CV, 2014 WL 4058727 (Tex. App.—Austin Aug. 14, 2014, no pet.) (mem. op.) ......................................................................................42

*Rea v. State*,
297 S.W.3d 379 (Tex. App.—Austin 2009, no pet.).................................. 41, 42

*Smith v. Abbott*,
311 S.W.3d 62 (Tex. App.—Austin 2010, pet. denied).....................................32

*Speck v. First Evangelical Lutheran Church of Hous.*,
235 S.W.3d 811 (Tex. App.—Houston [1st Dist.] 2007, no pet.)......................58

*State v. Epperson*,
121 Tex. 80, 42 S.W.2d 228 (1931) ....................................................................54

*Strayhorn v. Lexington Ins. Co.*,
128 S.W.3d 772 (Tex. App.—Austin 2004),
*aff'd*, 209 S.W.3d 83 (Tex. 2006) ............................................................ 36, 38

*Subaru of Am., Inc. v. David McDavid Nissan, Inc.*,
84 S.W.3d 212 (Tex. 2002) ............................................................ 22, 23, 25, 41

*Tara Partners, Ltd. v. City of S. Hous.*,
282 S.W.3d 564 (Tex.App.---Houston [14th Dist.] 2009, pet. denied) ........ 28, 29

*Tate v. King*,
No. 03-96-00532-CV, 1997 WL 217197, (Tex. App.—Austin May 1, 1997, no
writ) (mem. op.)....................................................................................................59

*Tex. Dep't. of Licensing & Regulation v. Roosters MGC, LLC*,
No. 03-09-00253-CV, 2010 WL 2354064 (Tex. App.—Austin June 10, 2010, no
pet.) (mem. op.) ............................................................................................ 25, 31

*Tex. Highway Comm'n v. Tex. Ass'n of Steel Imps., Inc.*,
372 S.W.2d 525 (Tex. 1963) ................................................................................54

*Tex. Mun. Power Agency v. Pub. Util. Comm'n*,
100 S.W.3d 510 (Tex. App.—Austin 2003, pet. denied)......................................31

*Tex. Mut. Ins. Co. v. Tex. Dep't. of Ins., Div. of Workers' Comp.*,
214 S.W.3d 613 (Tex. App.—Austin 2006, no pet.)................................. 2, 25, 26

*Tex. Student Hous. Auth. v. Brazos Cnty. Appraisal Dist.*,
No. 13-0593, 2015 WL 1870013 (Tex. Apr. 24, 2015)............................... 24, 31

*Thomas v. Long*,
207 S.W.3d 334 (Tex. 2006) ...............................................................................23

*Union Bankers Ins. Co. v. Shelton*,
889 S.W.2d 278 (Tex. 1994))..............................................................................25

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992) ...............................................................................55

x

*Westheimer Indep. Sch. Dist. v. Brockette*,
567 S.W.2d 780 (Tex. 1978) ............................................................ 24, 31

**STATUTES AND RULES**

22 TEX. ADMIN. CODE § 573.80(2) ............................................................ ix

22 TEX. ADMIN. CODE § 573.10(a) ............................................................ 35

22 TEX. ADMIN. CODE § 573.72 ............................................................ ix

22 TEX. ADMIN. CODE § 573.80(13) ............................................................ 35

TEX. CONST. Art. V, § 8 ............................................................ 22

TEX. GOV'T CODE § 2001.038 ............................................................ 14, 43

TEX. GOV'T CODE §§ 24.007-.008 ............................................................ 22

TEX. HEALTH & SAFETY CODE § 483 ............................................................ 15

TEX. HEALTH & SAFETY CODE § 821 ............................................................ 15

TEX. HEALTH & SAFETY CODE § 822 ............................................................ 15

TEX. HEALTH & SAFETY CODE § 823 ............................................................ 15

TEX. HEALTH & SAFETY CODE § 826 ............................................................ 15

TEX. HEALTH & SAFETY CODE § 828 ............................................................ 15

TEX. OCC. CODE § 801.001(4) ............................................................ 9

TEX. OCC. CODE § 801.001-.557 ............................................................ 27

TEX. OCC. CODE § 801.004 ............................................................ ix, 19

TEX. OCC. CODE § 801.004(1) .............................. xi, 28, 30, 30, 45, 46, 48, 50, 59

TEX. OCC. CODE § 801.151(b) ............................................................ 27

TEX. OCC. CODE § 801.351 ........................................................................11

TEX. R. CIV. P. 301 .................................................................................58

U.S. CONTROLLED SUBSTANCES ACT, 21 U.S.C. § 801, *et seq*..............................15

**OTHER AUTHORITIES**

38 TEX. REG. 5490, 5491 (2013) (to be codified as an amendment to 22 TEX. ADMIN CODE Rule § 573.80) .................................................................11

CITY OF SAN ANTONIO, TEXAS, CODE OF ORDINANCES, ch. 5..................................15

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY at 208 (1988)...........................48

## STATEMENT OF THE CASE

*Nature of the Case*:   This is a challenge to the Texas Board of Veterinary Medical Examiners's *ultra vires* prosecution of Dr. Ellen Jefferson, an animal-shelter veterinarian whose care and treatment of shelter animals falls squarely outside the agency's regulatory authority as expressly defined by the Texas Legislature.

*Trial Court*:   The Honorable Gisela D. Triana, sitting in the 250th Judicial District Court of Travis County, Texas

*Trial Court Disposition*:   Pursuant to the agreement of the parties, the trial court held a combined plea-to-the-jurisdiction hearing and trial on the merits on August 4, 2014. 2.RR.7-226. Following the trial, the trial court issued a letter ruling, 1.CR.852-54, followed by a judgment, 1.CR.855-57 (Ex. A). The trial court also issued findings of fact and conclusions of law. 2.CR.36-38 (Ex. B).[1]

The trial court's judgment:
- grants Defendants' plea to the jurisdiction "in part and dismisses Dr. Jefferson's claims under the Uniform Declaratory Judgment Act without prejudice" on the ground that "Dr. Jefferson must exhaust her administrative remedies," 1.CR.855;
- declares that Texas Administrative Code §§ 573.72 and 573.80(2) are "contrary to Section 801.004(1) of the Veterinary Practice Act and therefore invalid," 1.CR.856-57; *see also* TEX. OCC. CODE § 801.004 (Ex. C);
- issues unrequested declaratory relief apparently related to the TBVME's authority to enforce "other laws," 1.CR.856;

---

[1] The trial court clerk issued two volumes of the Clerk's Record but labeled both "Volume 1 of 1." This brief will refer to the volume filed on December 17, 2014 as Volume 1, and the volume filed on January 13, 2015 as Volume 2. Citations to the Clerk's Record herein will be in the form [Volume].CR.[Page]. Likewise, citations to the Reporter's Record will be in the form [Volume].RR.[Page] or, if the citation is to a page of an exhibit, [Volume].RR.[Exhibit:Page].

- remands the case "to the TBVME for further actions consistent with this order," 1.CR.857; and
- denies "[a]ll relief not expressly granted," 1.CR.857.

Defendants and Dr. Jefferson timely filed notices of appeal. 1.CR.866-67 (Defendants' Notice); 1.CR.871-72 (Dr. Jefferson's Notice).

## STATEMENT REGARDING ORAL ARGUMENT

Because those parts of the trial court's judgment in favor of Defendants directly contravene binding precedent from this Court and the Texas Supreme Court, this Court may deem it unnecessary to hear oral argument before reversing the trial court's error. Nonetheless, the Court may consider oral argument beneficial given the number of issues involved in this appeal and the unprecedented nature of the trial court's jurisdictional holding. Accordingly, to the extent the Court deems oral argument beneficial, Dr. Jefferson respectfully requests the opportunity to participate.

## ISSUES PRESENTED

1.      Did the trial court err by dismissing Dr. Jefferson's Uniform Declaratory Judgment Act claims?

        a.      Did the trial court err by dismissing Dr. Jefferson's UDJA claims for failure to exhaust administrative remedies given that the Legislature did not confer upon the TBVME exclusive jurisdiction over the regulation of an animal's care and treatment by its owner, owner's employee, or designated caretaker?

        b.      Even if the Legislature had conferred upon the TBVME exclusive jurisdiction over the regulation of an animal's care and treatment by its owner, owner's employee, or designated caretaker, does one of the many exceptions to the exhaustion-of-administrative-remedies doctrine apply?

        c.      Are other offered grounds for dismissal also without merit?

2.      Is Defendants' prosecution of Dr. Jefferson *ultra vires* and unlawful given that (1) the Texas Legislature explicitly exempted from the TBVME's authority the regulation of an animal's treatment or care "in any manner" by its owner, the owner's employee, or a designated caretaker, and (2) Dr. Jefferson's treatment and care of San Antonio Pets Alive's animals is—as a matter of law—treatment and care by the animal's owner, the owner's employee, or a designated caretaker?

3.      Did the trial court err by denying or dismissing Dr. Jefferson's request for mandamus relief from Oria's *ultra vires* prosecution of Dr. Jefferson for her care and treatment of San Antonio Pets Alive's animals?

4.      Did the trial court err by issuing unrequested, ambiguous, and legally incorrect declaratory relief regarding the TBVME's authority to enforce "other laws" against Dr. Jefferson in the context of the "owner exemption"?

This is a case about a state agency's failure to abide by the Legislature's clear limitation on its authority and the *ultra vires* prosecution of a nationally renowned veterinarian who has dedicated her life to fundamentally altering the direction of animal sheltering in America so as to save—rather than kill—the vast majority of impounded dogs and cats. Mindful of the values Texans place on private-property rights, the Texas Legislature has for decades expressly prohibited the Texas Board of Veterinary Medical Examiners—a state agency—from regulating the treatment or care of animals "*in any manner*" by the animals' owners, owners' employees, or designated caretakers pursuant to the so-called "owner exemption" to the Veterinary Licensing Act. Because it is undisputed that the animals cared for by Dr. Jefferson at issue in this case are owned by the non-profit animal shelter San Antonio Pets Alive ("SAPA"), and that Dr. Jefferson is the lead veterinarian and principal executive officer of SAPA, the agency's attempt to prosecute Dr. Jefferson contravenes Texas law and is *per se ultra vires*.

Even though the trial court agreed that the TBVME has no jurisdiction over animal-shelter veterinarians whose conduct falls under the "owner exemption," the agency successfully convinced the trial court that—contrary to black-letter Texas law—the court itself had no jurisdiction to stop the agency's unlawful acts. That holding is as wrong as the agency's distorted view of the law: when a state agency

has no jurisdiction to regulate a policy arena, it necessarily does not have exclusive jurisdiction to first decide disputes within that arena. In other words, when the Legislature says "no," it means "no"—regardless of how badly a state agency wants to creep far beyond the limits of its statutory authority. *See Tex. Mut. Ins. Co. v. Tex. Dep't. of Ins., Div. of Workers' Comp.*, 214 S.W.3d 613, 620 (Tex. App.—Austin 2006, not pet.) ("The question of whether an agency has . . . jurisdiction is resolved by determining *legislative* intent—not agency intent." (emphasis original)).

The TBVME's insistent failure to abide by the limits of its authority in this case is particularly odd in light of its public acknowledgment of its *lack* of authority in this very context just three short years ago. In 2012—contemporaneously with Dr. Jefferson's animal-shelter work at issue—the TBVME issued public guidance to animal-shelter veterinarians stating that the Veterinary Licensing Act's "owner exemption" prohibits the TBVME from regulating an animal shelter's treatment and care of animals once the animal shelters become the owners of the animals in their custody. Specifically, in its 2012 "Board Notes" publication, in a section authored by its Executive Director and Defendant Nicole Oria, the TBVME declared:

> After the ["stray hold"] time period for holding the animal has elapsed, usually three days and set by local ordinance, then the shelter may claim the animal is abandoned *and the shelter is the owner*. Under Texas law, [the shelter] or a caretaker designated by the [shelter] can perform acts of veterinary medicine on the animal . . .

2

*because the [shelters] and caretakers are exempt from the Veterinary Licensing Act*.

3.RR.PX18:EJ000638 (emphasis added) (Ex. D). The TBVME was right in 2012: an animal-shelter veterinarian's treatment of animals owned by the shelter is "exempt from the Veterinary Licensing Act" under the "owner exemption." *Id.* Accordingly, Dr. Jefferson's treatment of animals owned by San Antonio Pets Alive is "exempt from the Veterinary Licensing Act"—regardless of how badly the TBVME now wishes to prosecute her. *See id.*

Based on the uncontroverted facts, the plain language of the Veterinary Licensing Act, and settled Texas law, Dr. Jefferson therefore respectfully requests that this Court reverse those parts of the judgment rendered in favor of Defendants (including the trial court's dismissal of Dr. Jefferson's claims for "failure to exhaust"), render judgment that the agency's illegal prosecution of Dr. Jefferson is *ultra vires* and unlawful, and issue declaratory, injunctive, and mandamus relief prohibiting the agency's further prosecution of Dr. Jefferson with respect to her treatment and care of animals owned by San Antonio Pets Alive.

## STATEMENT OF FACTS

The Texas Board of Veterinary Medical Examiners and its Executive Director Nicole Oria forced this lawsuit by embarking on an illegal campaign to prosecute Austin community leader Dr. Ellen Jefferson for doing precisely what the agency said was fully legal at the time of Dr. Jefferson's work in question: providing treatment and care to impounded animals owned by animal shelters without regard to the inapplicable constraints of the Veterinary Licensing Act. The germane facts and circumstances leading up to the agency's unlawful prosecution of Dr. Jefferson's "No Kill" sheltering efforts began years earlier, when Dr. Jefferson put aside her private-practice veterinary career in order to make it her life's mission to save shelter pets.

**Dr. Jefferson Devotes Her Life to Helping Shelter Pets.**

Dr. Ellen Jefferson—the plaintiff in this case and the shelter veterinarian subject to the agency's overreach—has been licensed to practice veterinary medicine in Texas since 1998. 2.RR.124. After beginning her practice in Texas, she founded a non-profit animal-welfare organization in Austin, Texas, called Emancipet, to provide free and low-cost spay-neuter services to pet owners in need. 2.RR.126-27.[2] As a veterinarian, Dr. Jefferson has worked in the private-practice "fee for service" clinic context, for non-profits who deliver services to

---

[2] *See also* http://emancipet.org/ (last visited May 21, 2015).

client-owners of pets, and also for both public and private animal shelters that do not serve client-owners of pets but rather provide care to unowned, abandoned, or lost shelter pets.  2.RR.126-29, 133-34, 137, 145.  In addition to Emancipet and her current employment, for example, she has worked on behalf of animals at Austin's municipal animal shelter (then known as Town Lake Animal Center), the Austin Humane Society, the Williamson County Humane Society, Kyle Paws, and San Antonio Animal Care Services.  2.RR.145.

**Dr. Jefferson Resets Her Sights:  To Make Cities "No Kill" for Shelter Pets.**

In 2008, Dr. Jefferson became the executive director of Austin Pets Alive, 2.RR.124, an organization aimed at making Austin and Central Texas "No Kill" for shelter pets—meaning they would save all healthy and treatable impounded pets.[3]  Dr. Jefferson's remarkable success in shelter lifesaving at Austin Pets Alive quickly became a national story, attracting the attention of the then-Director of San Antonio's Office of Innovation and Reform—Joe Angelo—who had been tasked with finding a way to significantly reduce euthanasia at San Antonio's municipal shelter.  2.RR.70.

The performance of San Antonio's municipal shelter, according to city officials, was up to that time "wholly inadequate."  2.RR.69.  The city shelter typically impounded  about 30,000 animals per year, killing  roughly 70 percent of

---

[3] *See also* http://www.austinpetsalive.org/ (last visited May 21, 2015).

them. 2.RR.69. Angelo reasoned that in order to turn around San Antonio's facility, he had to look for the best of the best, and he found that in Dr. Jefferson of Austin Pets Alive. 2.RR.70. In the words of Angelo, "[w]e looked around at some of the best practices in the country," and Dr. Jefferson's work "was leagues above everybody else's." 2.RR.70.

**San Antonio Seeks Out Dr. Jefferson's "Pets Alive" Sheltering Model, and San Antonio Pets Alive Is Formed.**

Impressed by Dr. Jefferson's lifesaving success in Austin, the City of San Antonio began an effort to recruit her to do the same in the Alamo City. As part of their due diligence, Angelo and San Antonio's Deputy City Manager toured Austin Pets Alive—including the organization's medical facilities. 2.RR.71-72. Angelo observed that, like the City's own provision of medical services, Austin Pets Alive operated akin to a "MASH" unit where pets were given the care they needed, but not on the level of a "Boston General" style private facility. 2.RR.72-75. And that is what the City of San Antonio expected; city representatives understood that to save lives where intake is unlimited but resources are not, veterinary care must be streamlined for efficacy and efficiency. 2.RR.75-76. As Executive Director of San Antonio Animal Care Services Kathy Davis testified:

> It's a huge and overwhelming job to handle [the number of pets we handle] on a daily basis, and we have to triage them. We have to do a MASH-style service in order to be able to handle the huge volume that comes in on a daily basis.

6

2.RR.81. Davis later added that the City simply does not have the resources to pay for private-practice-level medical care at the shelter. 2.RR.92.

Satisfied with their due diligence on Dr. Jefferson and Austin Pets Alive, Angelo and the City of San Antonio sought and reached an agreement with Dr. Jefferson to bring the Austin Pets Alive model to San Antonio through a new non-profit organization called San Antonio Pets Alive ("SAPA"). 2.RR.77. Dr. Jefferson formed SAPA, and became its Executive Director in 2012. 2.RR.124, 151; 3.RR.PX5. The mission of San Antonio Pets Alive is undisputed: "[T]o save every adoptable dog and cat in danger of being killed at the City of San Antonio shelter." 2.RR.141; 3.RR.PX44; *see also* 2.RR.256 ("Q. So what is the purpose, then, when you take ownership of these dogs – when SAPA takes ownership of these dogs? A. To save their lives and get them adopted.").

San Antonio Pets Alive has been exceedingly successful in saving lives. SAPA saves about 8,000 dogs and cats per year from San Antonio Animal Services. 2.RR.161. They do so with approximately 50 employees and between 700 and 800 volunteers. 2.RR.162. They have physical shelters that house around 300 animals, with several hundred more living in temporary foster homes until they are able to be adopted. 2.RR.157.

The City of San Antonio agreed to sign up SAPA as a shelter placement partner and, consistent with the terms of its agreements with other shelter

placement partners, agreed to pay SAPA a flat fee for each animal rescued from the shelter. 2.RR.77; 3.RR.PX5. Pleased with the partnership, the City of San Antonio has repeatedly extended its agreement with San Antonio Pets Alive to save even more impounded pets. 3.RR.PX5,6,7. To maximize the lifesaving intent of the partnership, San Antonio Pets Alive only rescues pets from the shelter that the shelter has slated for euthanasia. 2.RR.85. In other words, Dr. Jefferson's organization is literally the last chance a shelter pet has in San Antonio to make it out alive. San Antonio's ultimate goal is to become, like Austin, a "No Kill" community. 2.RR.70-71.

Dr. Jefferson's role in San Antonio Pets Alive is all-encompassing. At all times relevant to the events in this case, Dr. Jefferson was SAPA's Executive Director, 2.RR.124, lead veterinarian, 2.RR.171, and "highest ranking corporate officer, vested with overall responsibility for SAPA's day-to-day affairs, including the care provided to its animals," 3.RR.PX43:EJ001539. She also serves on its Board of Directors. *Id.*

**Both Dr. Jefferson and the Texas Board of Veterinary Medical Examiners Understood at the Time of Her Challenged Conduct That the Agency Has No Jurisdiction Over Veterinary Care Provided by Shelters to Animals the Shelters Own.**

Critical to the determination of this appeal is the understanding of both Dr. Jefferson and the TBVME that it is and has always been perfectly lawful for an animal shelter that owns the pets in its custody to provide treatment and care for

8

those pets *in any manner* without the need to follow the various inapplicable requirements of the Veterinary Licensing Act or the rules promulgated thereunder; the agency simply has no authority or jurisdiction to regulate such care. Again, as Oria and the TBVME wrote in its Fall 2012 *Board Notes* publication:

> After the ["stray hold"] time period for holding the animal has elapsed, usually three days and set by local ordinance, then the shelter may claim the animal is abandoned *and the shelter is the owner*. Under Texas law, [the shelter] or a caretaker designated by the [shelter] can perform acts of veterinary medicine on the animal . . . without concern for establishing a veterinarian-client-patient relationship, *because the [shelters] and caretakers are exempt from the Veterinary Licensing Act*.

3.RR.PX18:EJ000638 (emphasis added). The evidence was uncontroverted that it was "common knowledge" in the animal-sheltering industry that—consistent with the TBVME's publication—animal shelters who own the animals in their care are exempt from the Veterinary Licensing Act by what is often referred to as the "owner exemption." 2.RR.144-45.[4] Dr. Jefferson too shared the TBVME's understanding that with respect to an animal owned by an animal shelter, the shelter and its caretakers "are exempt from the Veterinary Licensing Act." 3.RR.PX18:EJ000638; 2.RR.144-45. In fact, Dr. Jefferson testified that she was reassured by the agency's Fall 2012 *Board Notes* because they confirmed her prior

---

[4] *See* TEX. OCC. CODE § 801.001(4) (excepting from the Veterinary Licensing Act and TBVME's jurisdiction "the treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal, unless the ownership, employment, or designation is established with the intent to violate this chapter.").

9

understanding and belief that San Antonio Pets Alive operated in full and complete compliance with Texas law. 2.RR.148, 188.

**At Some Point, the Agency Decides That Stopping "No Kill" Shelters Is More Important Than Abiding by the Limits of Its Statutory Authority.**

Whenever someone revolutionizes an industry, those stuck in the past lash out; the animal-sheltering world is no exception. While nearly all national animal-welfare organizations (including Best Friends Animal Society,[5] Alley Cat Allies,[6] the No Kill Advocacy Center,[7] and the ASPCA[8]) now support efforts to dramatically decrease animal-shelter killing through what has been called the "No Kill" movement, there are holdouts who remain mired in the traditional save-a-few-and-kill-the-rest method of animal control. The controversial group PETA, for example, favors traditional kill shelters over those aiming to save the lives of all healthy and treatable pets.[9] At some point, the TBVME decided to take PETA's pro-killing side of the animal-sheltering world, derisively writing in the May 24, 2013 issue of the *Texas Register* that while the "No Kill" movement may be a "favorite cause" of animal lovers, the *real* purpose of an animal shelter is to kill animals—not save them. *See* 38 TEX. REG. 5490, 5491 (2013) (to be codified

---

[5] *See* http://bestfriends.org/Our-No-Kill-Mission/ (last visited July 5, 2015).

[6] *See* http://www.alleycat.org/catfatalities (last visited July 5, 2015).

[7] *See* http://www.nokilladvocacycenter.org/ (last visited July 5, 2015).

[8] *See* http://www.aspca.org/about-us/aspca-policy-and-position-statements/no-kill-community-coalitions (last visited July 5, 2015).

[9] *See* http://www.washingtonpost.com/local/virginia-politics/animal-bill-could-put-peta-out-of-the-shelter-business/2015/02/23/2f4f05b6-bb6a-11e4-b274-e5209a3bc9a9_story.html (last visited June 17, 2015).

as an amendment to 22 TEX. ADMIN CODE Rule § 573.80) ("While no-kill animal shelters have become a favorite cause of animal rights proponents in recent years, the primary public purpose of animal shelters is to remove sick, injured, unwanted and abandoned animals from contact with the public . . . ."). So when the agency saw an opening to prosecute Dr. Jefferson—the highest-profile "No Kill" advocate in Texas and arguably the entire nation—it jumped at the chance.

**The TBVME Begins to Prosecute Dr. Jefferson for Her Treatment and Care of Animals Owned by San Antonio Pets Alive.**

On December 27, 2013, the agency commenced its war on "No Kill" sheltering, choosing to begin prosecution efforts against the movement's leader for alleged conduct that the agency had proclaimed perfectly legal *just one year earlier*. *Compare* 1.CR.53-63 (alleging SAPA's veterinary care of its own animals violated the Veterinary Licensing Act because it was provided without first establishing a veterinarian-client-patient relationship), *with* 3.RR.PX18:EJ000638 (acknowledging that animal shelters need not establish a veterinarian-client-patient relationship with animals they own because they are exempt from the Veterinary Licensing Act).[10] In the agency's "Allegations" they presented to Dr. Jefferson (and attached to their plea to the jurisdiction in this case), the TBVME conceded

---

[10] The "veterinarian-client-patient-relationship" requirement is found in § 801.351 of the Texas Occupations Code. It requires that, prior to treating an animal, a veterinarian establish a relationship with both the animal *and* the animal's owner—a requirement that is effectively impossible to meet were it to apply in the animal-shelter context because the animals either do not have owners, their owners are unknown or unreachable, or the shelter itself has already become the owner. *See* TEX. OCC. CODE § 801.351.

that (1) Dr. Jefferson is "employed by San Antonio Pets Alive!, an animal rescue organization," and (2) the complaint made against Dr. Jefferson related to a dog "owned by San Antonio Pets Alive in San Antonio, Texas." 1.CR.117. Because those concessions squarely placed Dr. Jefferson's treatment of the dog outside of the agency's jurisdiction pursuant to the "owner exemption" of the Veterinary Licensing Act as recognized in the agency's own publication, Dr. Jefferson protested the agency's prosecution of her as illegal and without authority. 2.RR.190. Defendant Executive Director Nicole Oria's response? "Go [complain] to the Legislature." 2.RR.190.

**Dr. Jefferson Is Forced to Sue.**

Because Oria and her agency refused to follow the rule of law that they had publicly acknowledged just a year earlier, Dr. Jefferson was forced to file suit to stop their illegal prosecution. 1.CR.4-21. In her petition, Dr. Jefferson explained the success that both Austin Pets Alive and San Antonio Pets Alive have had in saving the lives of shelter pets, helping to bring Austin to an over 90% live-release rate and San Antonio to an almost 80% live-release rate. 1.CR.10. She also explained that by explicitly exempting medical care by animals' owners from the Veterinary Licensing Act, the Legislature prohibited the agency from regulating such care by shelter-owners like San Antonio Pets Alive. 1.CR.14-17. Accordingly, Dr. Jefferson asked the trial court to declare Oria and the agency's

12

conduct unlawful and *ultra vires*, and also sought temporary and permanent injunctive relief to stop the agency's *ultra vires* prosecution.

Oria and the TBVME responded by filing a plea to the jurisdiction asserting that (1) the agency has authority to investigate Dr. Jefferson and bring an action against her in the State Office of Administrative Hearings (SOAH); and (2) Dr. Jefferson's claims are not ripe because—according to the TBVME—while it has already concluded that Dr. Jefferson violated the Veterinary Licensing Act and the agency's rules promulgated thereunder, 1.CR.47, 133-35, Dr. Jefferson had not yet been injured by the agency because no final decision had been reached by the agency after a SOAH proceeding. 1.CR.69-71. The TBVME attached to its plea to the jurisdiction its "Allegations" against Dr. Jefferson, in which the agency conceded that (1) Dr. Jefferson was employed by San Antonio Pets Alive, and (2) San Antonio Pets Alive owned the animal whose care was questioned. 1.CR.117.

Before the trial court considered the agency's plea to the jurisdiction, the TBVME began the process of bringing even more disciplinary proceedings against Dr. Jefferson. *See* 1.CR.204-07. These too involved animals owned by San Antonio Pets Alive, 2.RR.41, and were instigated by the out-of-state no-kill opponent PETA, 1.CR.204-07. Tellingly, the City of San Antonio Police Department timely investigated the allegations and concluded that they were wholly unfounded. 3.RR.PX62,65. But that did not deter the TBVME.

13

As a result, Dr. Jefferson amended her original petition to add additional claims including a request for declaratory relief under Texas Government Code § 2001.038. 1.CR.216. Dr. Jefferson explained that the agency's various rules that attempted to overrule the Texas Legislature's limit on the TBVME's authority were illegal and invalid. 1.CR.216-22. Dr. Jefferson also sought mandamus relief to stop Oria's illegal and *ultra vires* acts. 1.CR.228-29.

**The Trial Court Agrees That the TBVME Has No Jurisdiction to Regulate Shelter Veterinarians' Treatment of Animals Owned by Shelters, But Holds That the Court Itself Has No Jurisdiction to Decide Dr. Jefferson's UDJA Claims.**

By agreement of the parties, the trial court held a combined hearing on the agency's jurisdictional plea and trial on the merits on August 4, 2014. The agency stipulated that San Antonio Pets Alive was the owner of the animals whose care it questioned. 2.RR.41-42. Dr. Jefferson called several witnesses, including herself, and the agency called none. 2.RR.68-200. Accordingly, the trial-court testimony and evidence was uncontroverted that:

- San Antonio Pets Alive owned the animals in its care, 2.RR.41-42;

- Dr. Jefferson's care and treatment of the animals was fully consistent with the care anticipated by the City of San Antonio in reaching out to Dr. Jefferson and agreeing to contract terms with San Antonio Pets Alive, 2.RR.72-76, 89;

- SAPA saves approximately 8,000 animals per year from the City's municipal animal shelter, 2.RR.161;

14

- Every animal at issue would have been euthanized by the City of San Antonio but for Dr. Jefferson and San Antonio Pets Alive's efforts to save them, 2.RR.85;

- Myriad other governmental entities (local, state, and federal) have jurisdiction over Dr. Jefferson's care of SAPA's animals, including the City of San Antonio, which found the allegations against her to not be credible, 2.RR.134-39, 83, 85, 88;[11]

- Dr. Jefferson is both the Executive Director and lead veterinarian of San Antonio Pets Alive and is thus responsible for making corporate decisions for the non-profit and for the caretaking of the animals owned by SAPA, 2.RR.124; 3.RR.PX43:EJ0001539; and

- The sole intent of Dr. Jefferson and the City of San Antonio in setting up San Antonio Pets Alive and transferring animals to SAPA from the City is to save animals' lives, 2.RR.141; 3.RR.PX44; 2.RR.70.

On September 5, 2014, the trial court issued a letter ruling invalidating contested agency rules that failed to recognize the "owner exemption," but also holding that the court itself was powerless to stop the TBVME's prosecution of Dr. Jefferson because she "must exhaust her administrative remedies . . . before the Court may review individual disputes" between Dr. Jefferson and the TBVME. 1.CR.852-53. Two months later, the court issued a final judgment largely in line

---

[11] The various governmental agencies that have jurisdiction over animal shelters' (like Dr. Jefferson and San Antonio Pets Alive's) care of animals include the United States Drug Enforcement Agency, *see* U.S. CONTROLLED SUBSTANCES ACT, 21 U.S.C. § 801, *et seq*.; the Texas Department of Public Safety, *see* TEX. HEALTH & SAFETY CODE § 483; the Texas Board of Health, *see* TEX. HEALTH & SAFETY CODE § 823; the Texas Department of State Health Services, *see generally*, TEX. HEALTH & SAFETY CODE §§ 822, 823, 826, §828; the county or municipal Animal Advisory Commission, *see* TEX. HEALTH & SAFETY CODE § 823; the governmental entity (if any) from whom the shelter is saving animals, *see, e.g.,* TEX. HEALTH & SAFETY CODE §§ 821, 823; CITY OF SAN ANTONIO, TEXAS, CODE OF ORDINANCES, ch. 5; and law-enforcement authorities that enforce animal-cruelty laws, *see, e.g.,* CITY OF SAN ANTONIO, TEXAS, CODE OF ORDINANCES, ch. 5.

15

with the letter ruling.  1.CR.855-57.  Both sides timely filed notices of appeal. 1.CR.866-87; 1.CR.871-72.

**Meanwhile, the Agency's *Ultra Vires* Prosecution Continues.**

Because the trial court concluded that it had no jurisdiction to determine Dr. Jefferson's Uniform Declaratory Judgment Act challenge to the TBVME's *authority* to prosecute her (as opposed to its contested rules, two of which the court held invalid), the agency has continued its prosecution by pursuing its claims against Dr. Jefferson before a SOAH judge.  After a hearing, the administrative law judge determined that Dr. Jefferson's treatment and care of San Antonio Pets Alive's animals is, in fact, exempt from the TBVME's jurisdiction under the facts of the case due to the "owner exemption" because: (1) SAPA owned the animals at issue; (2) SAPA provided its care and treatment of its animals through Dr. Jefferson, its Executive Director and lead veterinarian (and Dr. Jefferson was a designated caretaker of the animals); and (3) Dr. Jefferson did not intend to violate the Veterinary Licensing Act.  *See* SOAH Order (Ex. E).  However, the SOAH judge also concluded—based on language within the trial court's pre-judgment letter ruling—that the TBVME has authority to continue prosecutorial efforts against Dr. Jefferson for alleged violations of laws *other* than the Veterinary Licensing Act. *Id.*; *see also infra* Part IV. As a result, the TBVME's unlawful

16

prosecution against Dr. Jefferson continues, additional proceedings are scheduled, and Dr. Jefferson continues to be harmed.[12]

**The Legislature Is Not Happy with the TBVME's Shelter Prosecutions.**

In hearings on legislation related to this case, legislators strongly and repeatedly criticized the agency's *ultra vires* prosecution of animal-shelter veterinarians. Senator Charles Perry of Lubbock described Oria's testimony as evidencing the agency's "hypocrisy" and "inconsistency," and criticized the TBVME's position as being "so prescriptive that people are paralyzed to do their job." *See* Texas Senate Committee on Agriculture, Water & Rural Affairs hearing on April 27, 2015.[13] Senator Perry also explained that the agency's prosecution of shelter veterinarians fails to recognize the big picture:

> You have individual vets that are doing a yeoman's job most of the time on a voluntary basis. We have individual shelters that honestly, if it wasn't for them, there wouldn't be an animal to discuss 99 percent of the time. . . . [You're] kind of beating up an area that if it wasn't for the area, there would be no opportunity, if you will, to salvage the animals that need to be salvaged.

*Id.*

Senator Kirk Watson of Austin levied additional criticism upon the TBVME's conduct, stating that he found Oria's testimony regarding her regulation and treatment of animal shelters "disturbing." *Id.* He stated to Oria:

---

[12] It is not known whether the TBVME intends to abide by the SOAH judge's rulings in favor of Dr. Jefferson.

[13] Viewable at http://tlcsenate.granicus.com/MediaPlayer.php?view_id=30&clip_id=9952 (last visited June 18, 2015).

I will tell you that your testimony, I think, highlights one of the problems that we have at this state agency. . . . Let me just say this, and I mean no disrespect. Your testimony and your approach causes me to believe you may be in the wrong job. And your inability to clearly define how better to address an issue where you have communities that want "No Kill" policies, but have limited resources, . . . and the way you've approached it and the way you've approached your testimony today causes me grave concern. . . . You know the concern and I'm not seeing any effort to try to help fix the concern other than to say 'we want to stay out of court.'"

*Id.*

In another Senate hearing, Senator John Whitmire of Houston expressed his concern regarding the TBVME as well. *See* Senate Committee on Criminal Justice hearing on May 5, 2015.[14] There, Senator Whitmire stated:

I can't begin to tell you through my years, and even recently, . . . I get reports in my district of the board being very dictatorial [and] not sensitive to shelters trying to provide services. . . . [T]hey don't treat people, the public, the shelters, and even veterinarians with respect and sensitivities. . . . They need to realize they work for the public.

*Id.* Speaking directly to Oria, Senator Whitmire added: "From talking to my colleagues, you're building a pretty strong consensus in the Legislature that your board runs over people on a routine basis, and that's just uncalled for. . . . They are here to serve, and not dictate." *Id.*[15]

---

[14] Viewable at http://tlcsenate.granicus.com/MediaPlayer.php?clip_id=10049 (last visited June 18, 2015).

[15] While Oria lobbied the Legislature to pass a bill expressly excluding animal-shelter veterinarians from Veterinary Licensing Act's list of exemptions, Dr. Jefferson encouraged the Legislature to confirm the owner exemption. No legislation related to the issue passed during the 2015 legislative session.

Undeterred by the legislators' heated criticism, Oria and the TBVME's *ultra vires* prosecution of Dr. Jefferson continues—necessitating this appeal.

## SUMMARY OF THE ARGUMENT

At its core, this is a case about a state agency thumbing its nose at the Texas Legislature's specific, clear, and unambiguous curtailment of its authority. The agency no doubt wishes the law were different, but as Texas law has stated for more than 100 years, the Texas Board of Veterinary Medical Examiners has no authority to regulate the treatment and care of an animal by its owner or owner's designee. *See* TEX. OCC. CODE § 801.004. That means—as the TBVME itself recognized in 2012—that animal shelters like San Antonio Pets Alive may provide treatment and care to animals owned by the shelters without regard to the agency's inapplicable rules and regulations because shelters are "exempt" from the TBVME's jurisdiction as a matter of law. Because Dr. Jefferson's treatment and care of animals owned by her non-profit animal-rescue shelter San Antonio Pets Alive fall squarely within that exemption to the TBVME's authority, the agency's attempt to prosecute her for that treatment is *per se ultra vires*.

After a combined plea hearing and trial on the merits, the trial court agreed that the TBVME has no authority over animal-shelter veterinarians falling under the "owner exemption," but held—contrary to black-letter Texas law—that the court itself had no jurisdiction to stop the agency from prosecuting Dr. Jefferson

19

because Dr. Jefferson had not first exhausted administrative remedies. In other words, the trial court held that Dr. Jefferson must first fully submit herself to the TBVME's *ultra vires* prosecution of her before she can contest the authority of the TBVME to prosecute her in the first place. That holding is insulting to the rule of law (and, especially, the inherent limitations of governmental authority) and demonstrably incorrect under the Texas Constitution and settled Texas law, which make perfectly clear that Texas district courts have inherent constitutional jurisdiction over disputes in Texas unless the pleadings or evidence affirmatively negate the trial court's jurisdiction—which they did not here. Moreover, it is hornbook Texas law that the exhaustion-of-administrative-remedies doctrine *does not apply* to prevent Texas trial courts from adjudicating claims alleging that a government agency has acted outside the limits of its statutory authority.

For each of the reasons presented in this brief, this Court should reverse the trial court's erroneous dismissal of Dr. Jefferson's Uniform Declaratory Judgment Act claims and hold, pursuant to Texas law and the uncontroverted evidence, that Defendants' prosecution of Dr. Jefferson for her treatment and care of animals owned by San Antonio Pets Alive is *ultra vires* and unlawful.

**ARGUMENT**

**I.     THE TRIAL COURT ERRED BY DISMISSING DR. JEFFERSON'S UNIFORM DECLARATORY JUDGMENT ACT CLAIMS FOR FAILURE TO FIRST EXHAUST ADMINISTRATIVE REMEDIES BECAUSE—AS A MATTER OF LAW—THE DOCTRINE DOES NOT APPLY.**

Dr. Jefferson's first issue on appeal is the trial court's erroneous dismissal of her Uniform Declaratory Judgment Act claims, which asked the court to declare—among other things—that Oria and the TBVME have no authority to discipline Dr. Jefferson for her treatment and care of animals owned by San Antonio Pets Alive pursuant to the "owner exemption" of the Veterinary Licensing Act. 1.CR.213-16. Because the trial court did not reach the merits of Dr. Jefferson's UDJA claims—but instead dismissed them for failure to exhaust administrative remedies—the threshold issue as to her UDJA claims is this: did the trial court correctly determine that Dr. Jefferson's failure to first exhaust administrative remedies divested the trial court of its inherent authority to determine her challenge to the TBVME's *ultra vires* acts? Based on the plain language of the statute at issue and settled Texas law, the answer to that question is "no." Accordingly, the dismissal of Dr. Jefferson's UDJA claims should be reversed and her claims reinstated and reached.

**A.** **The Baseline Rules: Texas District Courts Have Subject-Matter Jurisdiction Unless It Is Expressly Taken Away, and Texas Governmental Agencies Have No Jurisdiction Unless It Is Expressly Given.**

The "analytical starting point" for determining an agency's objection to a trial court's jurisdiction "is article V, section 8 of the Texas Constitution," which "provides that a district court's jurisdiction 'consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body.'" *City of Round Rock v. Whiteaker*, 241 S.W.3d 609, 640 (Tex. App.—Austin 2007, pet. denied) (quoting TEX. CONST. art. V, § 8). In addition, "[t]he Legislature has provided by statute that district courts possess 'the jurisdiction provided by Article V, Section 8, of the Texas Constitution,' and 'may hear and determine any cause that is cognizable by courts of law or equity and may grant any relief that could be granted by either courts of law or equity.'" *Id.* (quoting TEX. GOV'T CODE §§ 24.007-.008); *see also Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 75 (Tex. 2000). Accordingly, Texas district courts "are courts of general jurisdiction," *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 220 (Tex. 2002), and are therefore *presumed* to "have subject matter jurisdiction" over a dispute "unless a contrary showing is made." *Whiteaker*, 241 S.W.3d at 640

22

(quoting *Subaru of Am.,* 84 S.W.3d at 220); *see also Dubai Petroleum*, 12 S.W.3d at 75.

On the other hand, "'there is *no* presumption that administrative agencies are authorized to resolve disputes. Rather, they may exercise only those powers the law, in clear and express statutory language, confers upon them,'" and "'[c]ourts will not imply additional authority to agencies, nor may agencies create for themselves any excess powers.'" *Whiteaker,* 241 S.W.3d at 641 (quoting *Subaru of Am.*, 84 S.W.3d at 220) (emphasis added); *see also Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006). In short, the baseline rule is clear: the trial court has jurisdiction, and the TBVME has no authority to divest the trial court of jurisdiction over any particular dispute, *unless* the Legislature has expressed its clear and plain intent to the contrary.

**B.      Dr. Jefferson Was Not Required to Exhaust Administrative Remedies Because the Legislature Did Not Confer Upon the TBVME Exclusive Jurisdiction Over the Treatment of Animals by Their Owners; And Regardless, Several Exceptions to the Exhaustion Doctrine Apply Here.**

The trial court's judgment "grants Defendants' plea to the Jurisdiction in part and dismisses Dr. Jefferson's claims under the Uniform Declaratory Judgment Act without prejudice" because "Dr. Jefferson must exhaust her administrative remedies. . . ." 1.CR.855. Failure-to-exhaust was not a ground raised in Defendants' jurisdictional plea. 1.CR.67-71. Regardless, there are many reasons

that the trial court's dismissal of Dr. Jefferson's UDJA claims for "failure to exhaust" is erroneous. Each reason will be briefed in turn, but the fundamental problem with the trial court's judgment is the simple and inexorable tenet of Texas jurisprudence that "when"—as here—"an agency is exercising authority beyond its statutorily conferred powers," "the doctrine of exhaustion of administrative remedies *is not applicable*." *Westheimer Indep. Sch. Dist. v. Brockette*, 567 S.W.2d 780, 785 (Tex. 1978) (emphasis added); *City of Sherman v. Pub. Util. Comm'n of Tex.*, 643 S.W.2d 681, 683-84 (Tex. 1983) (same); *see also Tex. Student Hous. Auth. v. Brazos Cnty. Appraisal Dist.*, No. 13-0593, 2015 WL 1870013, at *6 (Tex. Apr. 24, 2015) ("If an injured party with standing brings and proves an action seeking to confine [a government agency] within its statutory constraints . . . courts may intervene to provide an appropriate remedy, such as an injunction to prevent [the agency] from continuing to exceed its limited statutory authority."). The trial court's dismissal is in error.

> **1.  The Legislature did not confer upon the TBVME exclusive jurisdiction over the care and treatment of animals by their owners, owners' employees, or designated caretakers.**

Exhaustion of administrative remedies is not a legal requirement that exists "in the air," but rather becomes pertinent if (and only if) the Texas Legislature has assigned a governmental agency "exclusive" jurisdiction over the specific subject matter at issue in a particular dispute. *See Cash Am. Int'l Inc. v. Bennett*, 35

S.W.3d 12, 15 (Tex. 2000); *Tex. Dep't. of Licensing & Regulation v. Roosters MGC, LLC*, No. 03-09-00253-CV, 2010 WL 2354064, at *6 (Tex. App.—Austin June 10, 2010, no pet.) (mem. op.); *Tex. Mut. Ins. Co. v. Tex. Dep't. of Ins., Div. of Workers' Comp.*, 214 S.W.3d 613, 616 (Tex. App.—Austin 2006, no pet.). As this Court has explained, only when the Legislature has granted a state agency "the *sole* authority to make the initial determination in a dispute" does the agency have "exclusive jurisdiction," which in turn operates to require a party to first exhaust administrative remedies before filing suit. *Tex. Mutual*, 214 S.W.3d at 616 (emphasis original); *see also Cash Am.*, 35 S.W.3d at 15. Accordingly, the first issue in any failure-to-exhaust analysis is whether the agency has been granted exclusive jurisdiction over a specific dispute. *Tex. Mutual*, 214 S.W.3d at 616.

Whether a statute confers upon a state agency exclusive jurisdiction to first determine a dispute is a question of statutory construction, the purpose of which is "to give effect to the Legislature's intent." *Cash Am.*, 35 S.W.3d at 16 (citing *Union Bankers Ins. Co. v. Shelton*, 889 S.W.2d 278, 280 (Tex. 1994)). A statute may confer exclusive jurisdiction expressly (by stating that the agency has "exclusive, original jurisdiction" rather than "general and original power and jurisdiction"), *Subaru of Am.*, 84 S.W.3d at 223, or implicitly (by enacting "a pervasive regulatory scheme indicat[ing] that [the Legislature] intended for the regulatory process to be the exclusive means of remedying the problem"), *id.* at

25

221; *see also Whiteaker*, 241 S.W.3d at 641. Either way, the ultimate test for whether the Legislature has given an agency exclusive jurisdiction is whether the language of the statute in question "indicate[s] clearly or plainly that the Legislature intended" to divest Texas district courts of subject-matter jurisdiction over a particular dispute in favor of the state agency's initial determination. *Cash Am.*, 35 S.W.3d at 16. This decision is one for the Legislature—not the agency— and courts "cannot permit [an agency] to augment its statutorily-conferred jurisdiction merely because it asserts reasons of policy or practicality to do so." *Tex. Mutual*, 214 S.W.3d at 621; *see also BCY Water Supply Corp. v. Residential Inv. Inc.*, 170 S.W.3d 596, 600 (Tex. App.—Tyler 2005, pet. denied) ("Courts will not divine by implication additional authority to agencies, nor may agencies create for themselves any excess powers."). And, critically, the exclusive-jurisdiction inquiry is performed on a claim-by-claim basis, meaning that (1) even if an agency has exclusive jurisdiction generally over a subject matter, it may not have exclusive jurisdiction over a specific claim within that general subject matter, and (2) even if an agency has exclusive jurisdiction over one claim, it may not have exclusive jurisdiction over related claims. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 206-07 (Tex. 2002) (holding Motor Vehicle Board granted exclusive jurisdiction in statute, but not over plaintiff's declaratory judgment claims); *Whiteaker*, 241 S.W.3d at 641-42 (civil service commissions have exclusive

jurisdiction to determine some claims but not others); *Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 446 S.W.3d 58, 70-71 (Tex. App.—Houston [1st Dist.] 2014, pet. filed) (holding Railroad Commission has authority over "pervasive regulatory scheme" regarding "environmental issues incident to oil and gas production in Texas," but no statute "clearly or plainly indicate[s]" that the Legislature intended the Commission to have exclusive jurisdiction over landowners' environmental contamination claims). Thus, the first step in analyzing the trial court's dismissal of Dr. Jefferson's UDJA claims for failure to exhaust administrative remedies is to decide whether the Legislature conferred upon the TBVME exclusive jurisdiction over the treatment or care of an animal by its owner, owner's employee, or designated caretaker—*i.e.*, the "owner exemption." It did not.

First, no case can be made that the Legislature expressly conferred exclusive jurisdiction upon the TBVME; the words "exclusive jurisdiction" or any variation thereof are nowhere to be found in the Veterinary Licensing Act. *See* TEX. OCC. CODE § 801.001-.557. And while the TBVME is undoubtedly tasked with adopting a regulatory scheme of "rules of professional conduct appropriate to establish and maintain a high standard of integrity, skills, and practice in the veterinary medicine profession" generally, *id.* § 801.151(b), nothing in the Act or any other law places upon the agency any authority to regulate the provision of such care by an animal's owner, owner's employee, or designated caretaker. To

27

the contrary, the Legislature expressly excluded from the TBVME's authority such care. *Id.* § 801.004(1). It should go without saying that when the Legislature has exempted from an agency's authority the regulation of a specific arena within a broader regulatory scheme, the Legislature has necessarily *not* conferred upon that agency exclusive authority over the exempted arena.

Unsurprisingly, that is what Texas courts have uniformly held when facing the same question. In *Tara Partners, Ltd. v. City of S. Hous.*, for example, the court was tasked with determining whether the Texas Water Code conferred upon the Texas Commission on Environmental Quality exclusive jurisdiction to first adjudicate a rate dispute between a municipally owned water utility and ratepayers living within the corporate limits of the municipality. 282 S.W.3d 564, 571 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). In a plea to the jurisdiction, the city asserted that the trial court had no jurisdiction over the claims because the TCEQ had exclusive jurisdiction pursuant to the Water Code, which at the time conferred upon the agency pervasive general authority to adopt a regulatory scheme over water utilities. *Id.* But as the court of appeals explained, the appropriate legal inquiry was not whether the Legislature conferred exclusive subject-matter jurisdiction upon the agency *generally*, but rather "whether the [L]egislature intended the [prescribed] regulatory process as the exclusive means of remedying" the *specific* controversy—there, "a rate dispute between a

28

municipally owned water and sewer utility and ratepayers living within the corporate limits of that municipality." *Id.* The court answered that question "no" because despite the Legislature's provision of a pervasive water-utility regulation scheme, the Legislature expressly exempted from the agency's authority the "power or jurisdiction to regulate or supervise the rates or service of a utility owned and operated by a municipality. . . ." *Id.* at 573. In other words, where a statute confers upon an agency exclusive jurisdiction over a statutory scheme generally *but excepts* from that authority a more specific policy area, the statute does not confer exclusive jurisdiction over the excepted policy area.

The same conclusion was reached by the Texas Supreme Court in *City of Sherman v. Pub. Util. Comm'n of Tex.*, 643 S.W.2d 681 (Tex. 1983): when the Public Utility Commission was granted jurisdiction to regulate public utilities generally *but not* "municipally-owned utilities," the Commission had no exclusive jurisdiction to determine a dispute related to a city-owned utility's water usage. *Id.* at 685. Because "the legislative intent to exclude municipally-owned utilities from the Act's jurisdictional provisions is clear," *id.* at 684, the Court reasoned, the exhaustion-of-administrative-remedies doctrine did not apply, *id.* at 683.

And the same is true here. Although the Legislature unquestionably granted the TBVME authority generally to regulate the provision of veterinary care, it expressly excluded from the agency's jurisdiction the treatment or care of an

animal "in any manner" by the animal's owner, owner's employee, or designated caretaker. TEX. OCC. CODE § 801.004(1). As in *City of Sherman*, therefore, the legislative intent to exclude the more specific policy area from the agency's general regulation of a broader policy area "is clear." *See* 643 S.W.2d at 684. And because the Legislature excluded from the TBVME's authority regulation of the treatment or care "in any manner" under the "owner exemption," it necessarily follows that the Legislature did *not* confer "exclusive jurisdiction" upon the TBVME to determine disputes involving the "owner exemption." *See id.* at 683-84. Accordingly, the exhaustion-of-administrative-remedies doctrine is inapplicable, and the trial court's judgment to the contrary is in error. *See id.*

> **2. Even if the Legislature had granted the TBVME exclusive jurisdiction over conduct covered by the "owner exemption," several exceptions to the exhaustion-of-remedies doctrine apply to retain the trial court's jurisdiction over Dr. Jefferson's UDJA claims.**

A judicial determination that a dispute lies within an agency's exclusive jurisdiction does not end the exhaustion-of-administrative-remedies inquiry; rather, a court must next decide whether one of the many "exceptions to the doctrine" applies. *City of Sherman*, 643 S.W.2d at 683. Here, several of those exceptions apply to defeat the TBMVE's jurisdictional plea.

30

### a. The exhaustion doctrine does not divest a district court of jurisdiction to adjudicate claims alleging that a governmental agency is acting outside its authority.

It is black-letter law that the exhaustion-of-administrative-remedies doctrine is inapplicable to claims alleging that a state agency is acting outside of its statutorily conferred authority. As the Texas Supreme Court recently affirmed, "If an injured party with standing brings and proves an action seeking to confine [a government agency] within its statutory constraints . . . courts may intervene to provide an appropriate remedy, such as an injunction to prevent [the agency] from continuing to exceed its limited statutory authority." *Tex. Student Hous. Auth.*, 2015 WL 1870013, at *6; *see also City of Sherman*, 643 S.W.2d at 683 (explaining that the exhaustion doctrine does not apply to claims that an agency acted outside its authority); *Westheimer Indep. Sch. Dist.*, 567 S.W.2d at 785 (same). This Court has repeatedly confirmed this settled jurisdictional rule. *See Roosters MGC*, 2010 WL 2354064, at *6 (noting that the exhaustion-of-administrative-remedies doctrine does not apply to claims seeking "a declaration regarding [an agency's] general authority under a statute"); *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 100 S.W.3d 510, 520 (Tex. App.—Austin 2003) ("The narrow appellate procedure provided by the APA to attack a particular [agency] order, on any of the available grounds, does not displace the district court's ability to determine the scope of an agency's authority through a properly brought UDJA action. . . ."); *Larry Koch,*

31

*Inc. v. Tex. Natural Res. Conservation Comm'n*, 52 S.W.3d 833, 839-40 (Tex.

App.—Austin 2001, pet. denied).  As this Court has emphasized:

> In all events, however, the exhaustion rule is not without exceptions. For example, judicial intervention is not barred by the rule when an administrative agency purports to act outside its statutory powers.  In such a case, the purposes underlying the exhaustion rule are not applicable:  judicial and administrative efficiency are not served, and agency policies and expertise are irrelevant, if the agency's final action will be a nullity.

*Larry Koch*, 52 S.W.3d at 839-40.[16]

Here, it is undisputable that Dr. Jefferson's Uniform Declaratory Judgment

Act claims allege that the TBVME and Oria have acted outside the scope of their

authority by bringing disciplinary action against Dr. Jefferson for her care and

treatment of animals owned by San Antonio Pets Alive.    1.CR.213-16.

Furthermore, it is undisputable that Dr. Jefferson's claims challenge the agency

and Oria's authority to bring any such claims against her or other SAPA employees

and volunteers for their care and treatment of San Antonio Pets Alive's animals—

not just the specific allegations that the agency is presently advancing against Dr.

---

[16] *See also Smith v. Abbott*, 311 S.W.3d 62, 80 (Tex. App.—Austin 2010, pet. denied) (acknowledging that exhaustion of administrative remedies is not a ground for dismissal of "claims [that] allege acts ultra vires of [a state actor's] authority"); *Mag-T, L.P. v. Travis Cent. Appraisal Dist.*, 161 S.W.3d 617, 625 (Tex. App.—Austin 2005, pet. denied) ("An aggrieved party is excused from exhausting its administrative remedies if . . . an administrative agency purports to act outside its statutory powers."); *Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth.*, 96 S.W.3d 519, 527 (Tex. App.—Austin 2002, pet. denied) (listing exceptions to exhaustion doctrine); *Appraisal Review Bd. of Harris Cnty. Appraisal Dist. v. O'Connor & Assocs.*, 267 S.W.3d 413, 419 (Tex. App.—Houston [14th Dist.] 2008, no. pet.) ("[C]ourts may intervene in administrative proceedings when an agency exercises authority beyond its statutorily conferred powers. . . . [F]or this exception to apply, the [plaintiff] was required to allege that the agency had acted wholly outside its jurisdiction. . . .").

Jefferson. *Id.* Accordingly, Dr. Jefferson's claims fall squarely under the *ultra vires* exception to the exhaustion-of-administrative-remedies doctrine, and the trial court's holding to the contrary is patent error.

> **b.** **The exhaustion doctrine does not divest a district court of jurisdiction if forcing a plaintiff to first exhaust administrative remedies would subject the plaintiff to irreparable harm.**

The exhaustion-of-administrative-remedies doctrine also does not apply when having to first submit to an administrative process would cause or permit harm to the plaintiff that the administrative process itself cannot remedy. *Hous. Fed'n of Teachers, Local 2415 v. Hous. Indep. Sch. Dist.*, 730 S.W.2d 644, 646 (Tex. 1987). As the Texas Supreme Court has explained:

> Parties are not required to pursue the administrative process regardless of the price. If irreparable harm will be suffered and if the agency is unable to provide relief, the courts may properly exercise their jurisdiction in order to provide an adequate remedy.

*Id.* at 646. In *Hous. Fed'n of Teachers*, the Supreme Court held that a group of teachers did not have to first exhaust their administrative remedies to challenge the school district's lengthening of their workday because implementation of the new workday would "affect their child care arrangements, transportation arrangements, and second jobs." *Id.* at 645-46. The Court reasoned that because the teachers would thereby suffer "immediate and irreparable harm" if the plan were implemented while they first pursued an administrative remedy, and because the

33

administrative process itself could not provide any remedy for that harm, the trial court was not barred by the exhaustion doctrine from adjudicating the dispute. *Id.* at 646.[17]

In this case, the trial-court evidence was uncontroverted that the TBVME's *ultra vires* conduct is causing, has caused, and will cause irreparable harm to Dr. Jefferson and San Antonio Pets Alive that the administrative process cannot remedy. In fact, the harm to Dr. Jefferson and San Antonio Pets Alive of having to delay resolution of her challenge to the TBVME's *ultra vires* acts—until after the TBVME has *completed* its *ultra vires* acts against her—is more burdensome than that recognized as sufficient in *Hous. Fed'n of Teachers*. The uncontroverted evidence at trial indicated that it would be "impossible" for San Antonio Pets Alive to continue its highly successful lifesaving efforts under the TBVME's rules and view of the law. 2.RR.162. For example, the non-profit organization would not be able to use volunteers "for any kind of medical handling or treatment, even medicated baths," 2.RR.162, because the agency's rules prohibit a veterinarian from delegating care to non-veterinarians unless—among other things—the non-

---

[17] Both this Court and the Houston 14th Court of Appeals have likewise held that the exhaustion-of-administrative-remedies doctrine is not applicable when the plaintiff would incur irreparable harm by first pursuing administrative remedies. *Mag-T,* 161 S.W.3d at 625 ("An aggrieved party is excused from exhausting its administrative remedies if . . . the administrative remedies are inadequate and the exhaustion of administrative remedies would cause irreparable injury."); *City of Hous. v. Williams*, 99 S.W.3d 709, 715 (Tex. App.—Houston [14th Dist.] 2003, no. pet.) ("[E]xceptions to the doctrine . . . allow immediate access to Texas courts when . . . the exhaustion of remedies will cause irreparable injury or administrative remedies are inadequate.").

veterinarians are paid directly by a veterinarian (*not* by a governmental entity, animal shelter, or non-profit corporation). *See* 22 TEX. ADMIN. CODE § 573.10(a); *id.* § 573.80(13). Nor would SAPA be able to rely on its non-veterinarian employees to provide medical care under the agency's rules. 2.RR.162; *see supra*. In addition, the veterinarians SAPA does employ would be in jeopardy of losing their licenses if those rules applied to animal shelters. 2.RR.163. This threat is not hypothetical but very real and is already impacting SAPA's ability to save lives: following the agency's *ultra vires* investigation, one of SAPA's veterinarians resigned from the organization, and SAPA has been unable to attract other veterinarians to work on behalf of the shelter. 2.RR.163.

In essence, San Antonio Pets Alive's lifesaving operation would be shut down if the TBVME has its way. 2.RR.164. So too, likely, would the City of San Antonio's "No Kill" efforts. 2.RR.164. An organization that aims to save all of the animals impounded at a large open-admission animal shelter simply cannot comply with the TBVME's rules—which are directed towards private veterinary clinics, not animal shelters struggling every day to provide care and treatment for hundreds or thousands of animals. And, of course, the TBVME itself has no ability to remedy these substantial and dramatic harms if the agency is ultimately determined to be acting *ultra vires* after it completes its disciplinary process. No TBVME administrative remedy can undo or compensate Dr. Jefferson for the

damage its *ultra vires* acts are causing to Dr. Jefferson and SAPA. Thus, Dr. Jefferson and SAPA are caught in a "lose-lose" quagmire. Like the teachers in *Hous. Fed'n. of Teachers,* she is faced with either risking further and additional disciplinary actions for non-compliance, or facing substantial, direct, and immediate harm to her mission, her organization, and the animals she saves by complying with the agency's rules. Because she is facing and has incurred irreparable harm, the exhaustion doctrine does not defeat the trial court's jurisdiction over her claims. *See Hous. Fed'n. of Teachers,* 730 S.W.2d at 646.

### c.      The exhaustion doctrine does not divest a district court of jurisdiction to determine legal questions.

This Court has also repeatedly held that the exhaustion-of-administrative-remedies doctrine is inapplicable when the question presented is legal in nature and thus more appropriately addressed by the courts than by an administrative agency. *See Mag-T*, 161 S.W.3d at 625; *Strayhorn v. Lexington Ins. Co.*, 128 S.W.3d 772, 780 (Tex. App.—Austin 2004), *aff'd*, 209 S.W.3d 83 (Tex. 2006); *Friends of Canyon Lake*, 96 S.W.3d at 527 ("[T]he requirement of exhaustion of administrative remedies generally has been held inapplicable to questions of law."). As the Houston 1st Court of Appeals has written:

> [T]he administrative exhaustion requirement does not apply and, consequently, an aggrieved party may seek relief in the courts without overcoming that hurdle . . . if the issues presented involve a pure question of law, such as when the uncontroverted facts show that the board lacked authority to take the action that caused the harm. . . .

*Hous. Indep. Sch. Dist. v. Rose*, No. 01-13-00018-CV, 2013 WL 3354724, at *3 (Tex. App.—Houston [1st Dist.] July 2, 2013, no pet.) (mem. op.).

In this case, "the uncontroverted facts show that the board lacked authority" to discipline Dr. Jefferson for her care and treatment of animals owned by San Antonio Pets Alive. *See id.* As is fully explained in Part II of this brief, the uncontroverted evidence demonstrates that (1) San Antonio Pets Alive owned the animals in question; (2) Dr. Jefferson's care and treatment of SAPA's animals constituted the treatment or care of animals by the animals' owner, employee of the owner, or designated caretaker; and (3) San Antonio Pets Alive did not accept ownership of the animals and Dr. Jefferson did not set up her position with SAPA with the intent to violate the Veterinary Licensing Act. *See supra* Part II. To the contrary, Dr. Jefferson, the City of San Antonio, and San Antonio Pets Alive's intent at all times was to save animals' lives. *Id.* Accordingly, Dr. Jefferson's treatment and care of SAPA's animals falls squarely within the "owner exemption" to the Veterinary Licensing Act, and the TBVME thus has no authority over the matter. *Id.* And because these issues are determinable by review of the law and uncontroverted facts, the exhaustion doctrine does not apply.

### d. The exhaustion doctrine does not require a plaintiff to participate in an "exercise in futility."

Finally, the exhaustion-of-administrative-remedies doctrine does not divest a trial court of jurisdiction when pursuit of administrative remedies would be futile

37

under the circumstances. *Strayhorn*, 128 S.W.3d at 780-81; *Hous. Indep. Sch. Dist.*, 2013 WL 3354724, at \*4. For example, when the parties have been locked into adversarial positions and the agency itself is fully aware of the plaintiff's legal position but simply holds an opposing view of the law, there is no point in forcing the plaintiff to go through an administrative process before challenging the agency's view of the law. *Strayhorn*, 128 S.W.3d at 781. As this Court has said, doing so would be "an exercise in futility." *Id.*

Here, it is abundantly clear that the state agency is wholly aware of Dr. Jefferson's legal position and simply holds a different and opposite view of the law under the uncontroverted facts of the case. Indeed, there are no facts that require further development; the issue is simply a question of which parties' view of the law is right and which is wrong under the presented facts. Dr. Jefferson has repeatedly urged the agency and Oria to recognize that the TBVME has no authority under the facts of this case pursuant to the "owner exemption" to the Veterinary Licensing Act, and the agency has shown no interest in doing so.

In fact, during the initial administrative proceedings in this case, the TBVME acknowledged that Dr. Jefferson was an employee of San Antonio Pets Alive *and* that SAPA was the owner of the animals in question, 1.CR.117, yet still refused to follow the "owner exemption." When Dr. Jefferson protested in the hearing that the agency was not complying with the "owner exemption," Oria told

her to "go [complain] to the Legislature." 2.RR.140. In other words, Oria's mind is made up and she has shown no desire to reassess her position (even despite grilling from the Legislature).

What makes Oria's "Go to the Legislature" response particularly ironic is that Oria *herself* went to the Legislature, made slanderous and false allegations regarding Dr. Jefferson in a public legislative committee hearing, and lobbied the Legislature in favor of a bill that would expressly alter the Veterinary Licensing Act so as to exclude animal-shelter veterinarians from the list of persons and conduct exempt from the TBVME's jurisdiction. *See* Committee on Urban Affairs Committee on April 21, 2015.[18] In other words, Oria lobbied the Legislature *to change the law* in order to give the TBVME authority to prosecute animal-shelter veterinarians such as Dr. Jefferson, yet in this proceeding continues to claim that the agency *already* has authority to prosecute animal-shelter veterinarians. If that does not demonstrate the complete and utter futility of Dr. Jefferson continuing to participate in an *ultra vires* administrative proceeding in which the TBVME and Oria are both prosecutor and ultimate arbiter, nothing does. Because Texas law does not require a person to jump through futile administrative hoops to stop a government entity's *ultra vires* act, Dr. Jefferson need not first subject herself to the TBVME's *ultra vires* prosecution of her before contesting the agency's

---

[18] Viewable at http://tlchouse.granicus.com/MediaPlayer.php?view_id=37&clip_id=10813 (last visited June 19, 2015).

authority to prosecute her in the first instance. For this and the many other reasons presented herein, the trial court's stated ground for dismissing Dr. Jefferson's UDJA claims—her alleged failure to exhaust administrative remedies—is plainly incorrect.

## C. The Trial Court's Dismissal of Dr. Jefferson's UDJA Claims Is Also Not Justified on the Unreached Grounds Presented in Defendants' Plea to the Jurisdiction.

The trial court erroneously dismissed Dr. Jefferson's UDJA claims on the stated ground that Dr. Jefferson failed to exhaust administrative remedies. 1.CR.855; *see supra* Part I.A-B. Out of an abundance of caution, Dr. Jefferson will also briefly address the two unreached arguments advanced in the TBVME's plea: (1) that the agency has statutory authority to bring an enforcement action; and (2) lack of ripeness. 1.CR.69-71.

The TBVME's first argument—that it has general authority to bring any enforcement action against a licensed veterinarian—is not a ground for dismissing Dr. Jefferson's lawsuit, but rather is an argument on the merits of her claims. It is also incorrect: the Veterinary Licensing Act plainly *excludes* from the agency's general authority any regulation of the treatment or care of an animal "in any manner" by its owner, employee of the owner, or designated caretaker. TEX. OCC. CODE § 801.004(1). Thus, the agency's general authority is of no import to the resolution of this case (and it is in any event no ground for dismissal).

40

The agency's second argument in its plea—that Dr. Jefferson's UDJA claims are not "ripe" for judicial review, 1.CR.70-71—is also demonstrably wrong. To determine whether a dispute is ripe for judicial consideration, courts look to "(1) fitness of issues for judicial decision and (2) hardship to parties of withholding judicial review." *Mitz v. Tex. State Bd. of Veterinary Med. Exam'rs*, 278 S.W.3d 17, 26 (Tex. App.—Austin 2008, pet. dism'd) (citing *Perry v. Del Rio*, 66 S.W.3d 239, 250 (Tex. 2001)). Ripeness is established when the plaintiff has demonstrated "that [it] would suffer hardship if judicial review is withheld until administrative proceedings have concluded." *Id.* In turn, hardship is shown when participating in an administrative proceeding "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967), *abrogated on other grounds in Califano v. Sanders*, 430 U.S. 99 (1977)). Under this standard, Dr. Jefferson's claims are ripe.

First, as a threshold matter, even the case that the agency relies on to make its "ripeness" challenge—*Rea v. State*, 297 S.W.3d 379 (Tex. App.—Austin 2009, no pet.)—acknowledges that ripeness is inherent when a state agency is "act[ing] in excess of its powers and jurisdiction." *Id.* at 384 (citing *Subaru Am.*, 84 S.W.3d at 220). That is because being subjected to a governmental entity's *ultra vires* act is injurious in and of itself. Indeed, the Court in *Rea* specifically pointed out that

41

the litigant in that case "does not allege the Board . . . lacks authority to make an initial determination regarding the revocation of suspension of a . . . license." *Id.* at 384-85. The opposite is true here; that is the *very* claim that Dr. Jefferson advances. 1.CR.213-16.

Second, contrary to the agency's assertions, the fact that the TBVME has not *completed* its unlawful and *ultra vires* disciplinary action against Dr. Jefferson does not mean that her claims are necessarily "unripe." Rather, a claim is ripe when—as here—the agency has taken steps to impose requirements on a litigant or there is an "existing or continuing threat of liability or penalty." *R.R. Comm'n of Tex. v. CenterPoint Energy Res. Corp.*, No. 03-13-00533-CV, 2014 WL 4058727, at *3 (Tex. App.—Austin Aug. 14, 2014, no pet.) (mem. op.); *see also Mitz*, 278 S.W.3d at 26; *Abbott Labs.*, 387 U.S. at 153. Moreover, Dr. Jefferson's claims are "ripe" because following the agency's rules and view of Texas law would uncontestedly "require[] an immediate and significant change in [her and San Antonio Pets Alive's] conduct of their affairs with serious penalties attached to noncompliance." *Id.* (quoting *Mitz*, 278 S.W.3d at 26; *Abbott Labs.*, 387 U.S. at 153). The evidence was uncontroverted that complying with the agency's rules and view of Texas law would effectively destroy San Antonio Pets Alive's lifesaving efforts. *See supra*. SAPA would be unable to save the lives it saves through the heroic efforts of its non-veterinarian employees and volunteers. *Id.*

42

Indeed, according to the uncontroverted testimony, it would be impossible for SAPA to continue its current business practices without risking serious penalties for non-compliance with the agency's rules. *Id.* The TBVME put on no evidence to the contrary. Accordingly, Dr. Jefferson's claims are undoubtedly "ripe" for judicial review.[19]

---

[19] The trial court's judgment expressly dismisses Dr. Jefferson's UDJA claims for failure to exhaust administrative remedies. 1.CR.855. Likewise, the trial court's Findings of Fact and Conclusions of Law state that the trial court declines to reach the merits of Dr. Jefferson's claims (other than her rule challenges) pursuant to the doctrine of "exhaustion of administrative remedies." 2.CR.36. Nonetheless, in what appears to either be a typographical error or misstatement, the trial court also stated in a conclusion of law that Dr. Jefferson's UDJA claims should be dismissed because they are "redundant of the remedies [for Dr. Jefferson's rule-challenge claims] in Section 2001.038." 2.CR.38. To the extent this conclusion is deemed operative, it too is plainly incorrect and constitutes additional grounds for reversal of the trial court's judgment. Dr. Jefferson's UDJA claims broadly attacked the TBVME's actions as "in excess of its authorizations under the [Veterinary Licensing] Act" because they "interfere with or impair Dr. Jefferson's legal rights and privileges." 1.CR.213. Among other things, Dr. Jefferson's UDJA claims asked for declarations that Dr. Jefferson's (along with SAPA's foster parents' and volunteers') care and treatment of SAPA's animals falls under the Act's "owner exemption," and that the agency's and Oria's actions against Dr. Jefferson exceed their statutory authority. 1.CR.213-16. On the other hand, Dr. Jefferson's rules challenges under Texas Government Code § 2001.038 are limited to the challenges allowed by that Code—*i.e.*, challenges to "[t]he validity or applicability of" agency rules. 1.CR.216 (quoting TEX. GOV'T CODE § 2001.038(a)). Specifically, Dr. Jefferson challenged the validity and applicability of various TBVME rules under the facts at issue and asked that they be invalidated. 1.CR.216-23. Thus, her UDJA claims are not redundant with her rule challenges. Moreover, even if they were, that would not be a ground for *dismissing* her UDJA claims. There is no authority in Texas for the proposition that a claim's redundancy is grounds for lack of jurisdiction, and such a holding would violate the constitutional and legal principle that Texas courts begin with inherent subject-matter jurisdiction unless the Legislature has provided otherwise. *See supra*. Accordingly, any operative conclusion that Dr. Jefferson's UDJA claims (which attacked the TBVME's *statutory authority*) are subject to dismissal because they are "redundant" with her rule challenges (which attacked the TBVME's *rules*) is patently erroneous and adds additional reversible error into the record.

## II. THE TRIAL COURT SHOULD HAVE DECLARED—AND THIS COURT SHOULD DECLARE—THAT THE BOARD'S PROSECUTION OF DR. JEFFERSON FOR HER TREATMENT AND CARE OF ANIMALS OWNED BY SAN ANTONIO PETS ALIVE IS ULTRA VIRES AND UNLAWFUL.

Given that the trial court had jurisdiction to determine Dr. Jefferson's UDJA claims, *see supra* Part I, the trial court should have reached the merits of those claims based on the uncontroverted evidence and testimony presented by Dr. Jefferson at the combined plea hearing and trial on the merits. While Dr. Jefferson sought a number of declarations, her claims boil down to one central verity: pursuant to the "owner exemption" to the Veterinary Licensing Act, the TBVME has no authority over Dr. Jefferson's care and treatment of the animals owned by San Antonio Pets Alive. Based on the plain language of the "owner exemption" and the uncontroverted evidence presented at trial, this Court should hold that the TBVME's proceedings against Dr. Jefferson are *ultra vires* and unlawful. At worst, the Court should remand the case to the trial court for consideration of the merits.[20]

The heart of this case is the "owner exemption" to the Veterinary Licensing Act, which explicitly excludes from the TBVME's authority—and thereby

---

[20] The trial court declined to determine the facts necessary to apply the "owner exemption" and thus neither expressly nor impliedly found such facts for or against either party. *See* 1.CR.855-57; 2.CR.36-38. Nor is there legally sufficient evidence to support fact findings against Dr. Jefferson that would preclude application of the "owner exemption," and the facts are uncontroverted and were demonstrated in her favor as a matter of law. *See* Part II; *see Dow Chem. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). Because there is no evidence creating a fact issue that would prevent summary judgment in Dr. Jefferson's favor as to the application of the "owner exemption," this Court should reach the exemption's application and render judgment that the exemption applies and that the TBVME's prosecution of Dr. Jefferson is *ultra vires*.

prohibits the agency from regulating—the "treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal, unless the ownership, employment, or designation is established with the intent to violate [the Act]." TEX. OCC. CODE § 801.004(1). In this case, the TBVME stipulated that San Antonio Pets Alive was the owner of the animals in the shelter's care, 2.RR.41-42, leaving just two merits questions to be resolved: (1) whether Dr. Jefferson's provision of medical care to SAPA's animals constituted "the treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal; and (2) whether San Antonio Pets Alive's ownership of its animals, or Dr. Jefferson's role with the non-profit, was "established with the intent to violate" the Act. Those questions were answered at trial.

### A. Dr. Jefferson's Care and Treatment of San Antonio Pets Alive's Animals Was "By the Owner of the Animal, an Employee of the Owner, or a Designated Caretaker of the Animal."

The first merits issue to resolve is whether Dr. Jefferson's care and treatment of San Antonio Pets Alive's animals was "by the owner of the animal, an employee of the owner, *or* a designated caretaker of the animal." TEX. OCC. CODE § 801.004(1) (emphasis added). The Legislature's use of the word "or" in the provision creates a disjunctive list of categories, any of which can be demonstrated to meet the exclusion. *See E. Tex. Salt Water Disposal Co., Inc. v. Werline*, 307

45

S.W.3d 267, 271 (Tex. 2010).  As a matter of law and fact, Dr. Jefferson met the exemption's requirement.

First, Dr. Jefferson's actions *were* the actions of the owner of the animals— San Antonio Pets Alive.  It is elementary law that as legal fictions, corporations cannot physically act on their own behalf but instead "must act through human agents."  *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 762 (Tex. 2006) (citing *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995)); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997) ("Corporations can, of course, 'act only through agents of some character.'") (quoting *Fort Worth Elevators Co. v. Russell*, 123 Tex. 128, 70 S.W.2d 397, 402 (1934)).  As a result, "[a]s a general rule, the actions of a corporate agent on behalf of the corporation *are deemed the corporation's acts*."  *Holloway*, 898 S.W.2d at 795 (emphasis added).  Just as, for example, a corporation's in-house attorney's work is an act of the corporation itself, Dr. Jefferson's in-house veterinary work is an act of San Antonio Pets Alive.  *See Hexter Title & Abstract Co., Inc. v. Grievance Comm., Fifth Cong. Dist., State Bar of Tex.*, 142 Tex. 506, 179 S.W.2d 946, 953-54 (Tex. 1944) ("His acts are the acts of the corporation. . . .").  Thus, Dr. Jefferson's care and treatment of SAPA's animals *is* "by the owner of the animal[s]."  TEX. OCC. CODE § 801.004(1).

Dr. Jefferson would meet even the strictest exception to Texas's rule that the acts of corporate agents constitute the acts of the corporation:  the exception for

46

punitive damages. *See Hammerly Oaks*, 958 S.W.2d at 391. In *Hammerly Oaks*, the Texas Supreme Court explained that for purposes of determining whether a corporation may be liable for punitive damages for the acts of a person, Texas law has a stricter rule that distinguishes between the acts of "the corporation itself" (for which punitives may be awarded) and "that of a mere servant or employee" (for which punitives may not be awarded). *Id.* (citing *Fort Worth Elevators*, 70 S.W.2d at 406). A person's acts are those of "the corporation itself" if the person fits into any of "four classes of corporate agents: (a) Corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business." *Id.*

Here, the evidence is conclusive and uncontroverted that Dr. Jefferson fits into several of these categories. She is uncontestedly a corporate officer of SAPA: she is the Executive Director and a board member. 2.RR.124; 3.RR.PX43:EJ001539. She is also the "highest ranking corporate officer, vested with overall responsibility for SAPA's day-to-day affairs, including the care provided to its animals." 3.RR.PX43:EJ001539. Thus, she is charged with the "absolute duties of the master," and "the management of the whole or a department or division of [the] business." *Hammerly Oaks*, 958 S.W.2d at 391 (quoting *Fort*

47

*Worth Elevators*, 70 S.W.2d at 406). Accordingly, Dr. Jefferson's provision of care and treatment of animals owned by San Antonio Pets Alive is—as a matter of law—"the treatment or care of an animal in any manner by the owner of the animal." TEX. OCC. CODE § 801.004(1).

Dr. Jefferson is also "a designated caretaker of the animal[s]" owned by San Antonio Pets Alive. *Id.* As the Executive Director and lead veterinarian of San Antonio Pets Alive, Dr. Jefferson rightfully had the ability to include herself as one of the "designated caretakers" for the shelter animals owned by and in the custody of San Antonio Pets Alive. The word "caretaker" means "one that takes care of" or "one that gives physical or emotional care and support." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY at 208 (1988). It cannot seriously be asserted that as the lead veterinarian who provided treatment and care for the SAPA animals at issue, Dr. Jefferson was somehow not a "designated caretaker" of the animals. For this reason too, she satisfies the "owner exemption."

And finally, Dr. Jefferson was an "employee of the [animals'] owner"—San Antonio Pets Alive. TEX. OCC. CODE § 801.004(1). Again, it is undisputed that Dr. Jefferson is the Executive Director and lead veterinarian of San Antonio Pets Alive, 2.RR.124, and is SAPA's "highest ranking corporate officer, vested with overall responsibility for SAPA's day-to-day affairs, including the care provided to its animals." 3.RR.PX43:EJ001539. The Internal Revenue Service includes

48

corporate officers in its definition of "an employee of the corporation" *unless* she "does not perform any services or performs only minor services *and* . . . neither receives nor is entitled to receive, directly or indirectly, any remuneration." 26 CFR 31.3121(d)-1. Although the TBVME in attachments to its plea to the jurisdiction (and at all times prior to this lawsuit being filed) conceded that Dr. Jefferson was an employee of SAPA, 1.CR.117, it nonetheless contested Dr. Jefferson's employment status at trial by alleging that she failed to pay herself. But Dr. Jefferson demonstrated at trial that she *did* receive remuneration from San Antonio Pets Alive, albeit indirectly, from a transfer of monies from San Antonio Pets Alive to Austin Pets Alive to pay for her services. 2.RR.125 ("San Antonio Pets Alive paid $35,000 towards my salary."). And regardless, even if she had not received remuneration from SAPA, that would only preclude her from meeting the IRS's definition of an "employee" if she also did "not perform any services or perform[ed] only minor services" for San Antonio Pets Alive—and it is undisputed that she performed both all managerial and lead veterinary services for the organization. *See supra*. Thus, although Dr. Jefferson's work need only qualify as one of the three categories of conduct falling under the "owner exemption," she met all three requirements at trial.[21]

---

[21] In addition, after the treatment and care in question, the Board of Directors of San Antonio Pets Alive adopted and ratified Dr. Jefferson's care and treatment of animals as the care and treatment of San Antonio Pets Alive itself, and ratified her caretaker designation. 2.RR.196-97; 3.RR.PX43; *see Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998) (corporation may ratify agent's actions as its own).

**B.     Dr. Jefferson Established San Antonio Pets Alive with the Intent to Save Animals' Lives—Not to Violate a Law.**

The last merits inquiry regarding the application of the "owner exemption" is whether "the ownership, employment, or [caretaker] designation [was] established with the intent to violate" the Veterinary Licensing Act.  TEX. OCC. CODE § 801.004(1).  On this point too, the evidence was uncontroverted and conclusive:  Dr. Jefferson and the City of San Antonio (from whom the animals were transferred to San Antonio Pets Alive) established SAPA's ownership of the animal, and Dr. Jefferson established San Antonio Pets Alive (and her position with and duties thereunder), for the sole purpose of saving animals' lives—*not* with an intent to violate the Veterinary Licensing Act.

The concept for San Antonio Pets Alive did not even begin with Dr. Jefferson but rather the City of San Antonio, whose then-Director of the Office of Innovation and Reform, Joe Angelo, was tasked with developing a strategy to save more pets' lives at San Antonio's municipal shelter—which at the time was killing 70 percent of impounded animals and described by Angelo as "wholly inadequate."  2.RR.69-70.  Angelo conducted a national review of animal-shelter best practices and concluded that Dr. Jefferson's work at Austin Pets Alive was "leagues above everybody else's."  2.RR.70.  From there, the two ended up reaching an agreement for a new non-profit, San Antonio Pets Alive, to contract with the City of San Antonio to become a high-volume partner to rescue animals

50

from the City's municipal shelter.  3.RR.PX5.  The evidence was uncontroverted that at no point in the negotiations or discussions in setting up San Antonio Pets Alive or its contract with the City of San Antonio did the idea of violating the Veterinary Licensing Act ever cross Angelo's mind.  2.RR.76.  The *only* goal was to save animals' lives and to "help San Antonio get to no-kill [status]."  2.RR.71.

In addition, Dr. Jefferson's uncontroverted testimony demonstrated that neither SAPA's ownership of the animals nor the establishment of Dr. Jefferson's role was in any way intended to violate the Act.  Her intent in forming San Antonio Pets Alive was singular and simple:  "to save every adoptable dog and cat in danger of being killed at the City of San Antonio shelter."  2.RR.141.  In no way did Dr. Jefferson intend to violate the Veterinary Licensing Act.  To the contrary, Dr. Jefferson explained that it was her full understanding—and in fact, it was "common knowledge" among animal shelters—that once a shelter owns an animal, it is completely legal for the shelter to provide treatment and care to those owned animals without violating the Veterinary Licensing Act.  2.RR.144-50.  Indeed, at the same time that San Antonio Pets Alive was taking ownership of the animals in question, the TBVME *itself* was issuing public guidance stating that animal shelters *do not violate the Veterinary Licensing Act by* providing veterinary care to animals they own without regard to the Act's requirements.  Again, in the TBVME's 2012 "Board Notes" publication, the agency wrote:

> After the ["stray hold"] time period for holding the animal has elapsed, usually three days and set by local ordinance, then the shelter may claim the animal is abandoned *and the shelter is the owner*. Under Texas law, [the shelter] or a caretaker designated by the [shelter] can perform acts of veterinary medicine on the animal . . . without concern for establishing a veterinarian-client-patient relationship, *because the [shelters] and caretakers are exempt from the Veterinary Licensing Act*.

3.RR.PX18:EJ000638 (emphasis added).

This is no small point: the TBVME in this litigation is actually taking the position that Dr. Jefferson intended to violate the law *by following the TBVME's own publicly disseminated legal guidance to shelters issued contemporaneously with San Antonio Pets Alive taking ownership of the animals at issue*. Oria and her agency in this regard are not only inconsistent, hypocritical, and illogical, but their argument is nearly frivolous. It simply cannot be that a person subjectively intends to violate a law by acting with the understanding that the person's conduct is in full and complete compliance with the law as publicly proclaimed by the very governmental agency charged with enforcing the law. The evidence is uncontroverted that the City of San Antonio and Dr. Jefferson did not intend to violate the Veterinary Licensing Act when they transferred ownership of the animals from the City to San Antonio Pets Alive, and Dr. Jefferson did not intend to violate the Act when she set up and took own her positions in San Antonio Pets Alive. Both organizations' and Dr. Jefferson's sole purpose with regard to all of the acts in question was single-minded: to save lives.

52

## III. THE TRIAL COURT ALSO ERRED BY DENYING DR. JEFFERSON'S REQUEST FOR MANDAMUS RELIEF.

In addition to her UDJA claims (which were dismissed) and her rule challenges (two of which were granted), Dr. Jefferson brought a mandamus claim against Oria. 1.CR.228. As Dr. Jefferson explained to the trial court, Oria's *ultra vires* prosecution of Dr. Jefferson violated the "owner exemption" to the Veterinary Licensing Act and thereby exceeded her authority as explicitly limited by the Texas Legislature. 1.CR.43-44, 388-89, 425-26; *see also supra* Part II. Defendants filed no plea to the jurisdiction contesting the trial court's jurisdiction over Dr. Jefferson's mandamus claim, and the trial court did not expressly address Dr. Jefferson's mandamus claim in its judgment, but did deny "[a]ll relief not expressly granted" in the judgment. 1.CR.857. Thus, it appears that Dr. Jefferson's mandamus claim was reached but denied on non-substantive grounds (because the trial court expressly declined to determine whether the "owner exemption" applied to Dr. Jefferson's work at San Antonio Pets Alive). That too was in error.[22]

In trial-court briefing, Defendants asserted—without authority—that "[m]andamus is barred by sovereign immunity." 1.RR.327. That is incorrect:

---

[22] It is also plausible that the trial court impliedly dismissed Dr. Jefferson's mandamus claim for failure to exhaust administrative remedies. In any event, the legal analysis is the same. The trial court had jurisdiction to reach Dr. Jefferson's mandamus claims because the exhaustion doctrine does not apply to her claims. *See supra* Part I. And her mandamus claim is correct on the merits. *See infra.*

mandamus is available to compel a government official to perform a mandatory duty "without implicating sovereign immunity." *Whiteaker*, 241 S.W.3d at 628 (citing *State v. Epperson*, 121 Tex. 80, 42 S.W.2d 228, 231 (1931) (suit to compel tax collector to give back wrongfully withheld funds can be brought without the consent of the state)). When—as here—"the complained-of acts of a state official are illegal or outside [her] authority, 'an entity or person whose rights have been violated . . . may bring suit to remedy the violation or prevent its occurrence, and such a suit is not a suit against the State requiring legislative or statutory authorization.'" *Id.* at 628 (quoting *Dir. of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*, 600 S.W.2d 264, 265-66 (Tex. 1980) and citing *Tex. Highway Comm'n v. Tex. Ass'n of Steel Imps., Inc.*, 372 S.W.2d 525, 530-31 (Tex. 1963); *Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709, 712 (1945); *Epperson*, 42 S.W.2d at 231).[23] Here—as explained above—Oria's continued prosecution of Dr. Jefferson was and is illegal and outside her statutory authority, and thus unprotected by sovereign immunity.

Defendants alternatively argued that mandamus relief should be denied because "Dr. Jefferson has an adequate remedy at law, that being a suit for judicial review" after the agency completes its illegal prosecution of Dr. Jefferson.

---

[23] *See also Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 404 (Tex. 1997) ("A state official's illegal or unauthorized actions are not acts of the State. Accordingly, an action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars.").

1.CR.327; *see also* 1.CR.457-58.  Specifically, citing *Walker v. Packer*, 827 S.W.2d 833, 841 (Tex. 1992), Defendants assert that the costs to Dr. Jefferson "of having to go through trial and the appellate process does not make the remedy at law inadequate."  1.CR.458.  But as this Court is well-aware, that is no longer the law in Texas. *See In re McAllen Med. Ctr, Inc.*, 275 S.W.3d 458, 469 (Tex. 2008) (orig. proceeding) (rejecting "*Walker*'s categorical approach").  Instead, the Texas Supreme Court has held that mandamus *is* appropriate to intervene in "cases in which the very act of proceeding. . . —regardless of outcome—would defeat the substantive right involved." *Id.* at 465.  Moreover, the adequacy of an alternative remedy by appeal is determined by a "careful balance of jurisprudential considerations." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding).  "An appellate remedy is [only] 'adequate' when any benefits to mandamus review are outweighed by the detriments." *Id.*

Here, there is no benefit to an *ultra vires* prosecution of Dr. Jefferson, and there are substantial harms to Dr. Jefferson—including unnecessary legal fees, disparagements to her and her organization's character, and making it nearly impossible for SAPA to do the lifesaving work for which it was founded.  Again, the evidence was uncontroverted that SAPA would effectively be shut down if it had to comply with the agency's rules pending administrative resolution of the matter because SAPA would be unable to save animals' lives using the volunteers

55

and non-veterinarian employees it currently uses to provide completely legal care and treatment for impounded animals. *See supra* Part I.B.2.b. These are all things for which the TBVME's administrative process has no remedy at all; no rules or statute empower the administrative process to remedy the dramatic harm caused by the TBVME's *ultra vires* acts. The harm cannot be undone.

Finally, Dr. Jefferson's mandamus request is valid on the merits. Mandamus relief is appropriate and available not only to compel a government official "to perform a ministerial act," *Janek v. Harlingen Family Dentistry, P.C.*, 451 S.W.3d 97, 101 (Tex. App.—Austin 2014, no pet.), but also to protect a person "from illegal or unauthorized acts" of government "officials" sued "in their official capacities," *Hamilton v. Washington*, No. 03-11-00594-CV, 2014 WL 7458988, at *5 (Tex. App.—Austin Dec. 23, 2014, no pet.) (mem. op.). Dr. Jefferson has demonstrated both. As already explained, Oria has no authority to bring disciplinary proceedings against Dr. Jefferson for her care and treatment of animals owned by San Antonio Pets Alive because that care falls squarely within the "owner exemption" to the Veterinary Licensing Act. *See supra* Part II. By the Legislature's clear directive (and as recognized by Oria in the 2012 *Board Notes*), Oria has no authority to discipline animal-shelter veterinarians for their care and treatment of animals owned by the shelter. *Id.* Oria's actions are therefore "illegal" and "unauthorized." *See Hamilton*, 2014 WL 7458988, at *5. In

56

addition, Oria has no authority or discretion to continue such *ultra vires* proceedings, and a mandatory duty to refrain from enforcement actions for which she and the TBVME have no statutory authority. She thus has no discretion to pursue actions against Dr. Jefferson, and her failure to perform the ministerial act of dropping proceedings in light of the application of the "owner exemption" merits and necessitates mandamus relief. *See Janek*, 451 S.W.3d at 101.

## IV. THE TRIAL COURT ERRED BY ISSUING UNREQUESTED, AMBIGUOUS, AND LEGALLY INCORRECT DECLARATIONS.

The last part of the trial court's judgment issues what appears to be a declaration of the TBVME's authority to enforce "other laws" against animal-shelter veterinarians. It states:

> The Court, however, does find that the ownership exception does not allow a veterinarian to ignore other laws outside the Act that relate to his or her veterinary license, including all laws relating to the handling of prescription drugs (dangerous or controlled). Because it is the veterinary license, not the ownership of the animals, that allows a veterinarian to take certain actions, those actions may be overseen by TBVME to ensure compliance. Such investigations and administrative actions are not categorically banned by the ownership exemption and the Court will not prevent TBVME from exercising its administrative powers to investigate such complaints. In exercising its quasi-judicial authority in overseeing the administrative process, however, TBVME must do so in accordance with the boundaries of the Act, and with proper and due regard for the owner exemption, as mandated by the Texas Legislature.

1.CR.856. No such declaration was requested in the pleadings of either party, and candidly, it is not even clear what this particular passage of the judgment means. It

should be reversed and struck from the judgment in its entirety; alternatively, it should be modified to cure ambiguity.

A judgment cannot be granted on a ground not asserted in a motion. *G&H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011); *Speck v. First Evangelical Lutheran Church of Hous.*, 235 S.W.3d 811, 819 (Tex. App.— Houston [1st Dist.] 2007, no pet.). Accordingly, the passage quoted above is erroneous on its face because no party requested such declaratory relief in any motion before the trial court. In addition, a judgment cannot be awarded on a claim not advanced in a party's live pleadings, TEX. R. CIV. P. 301, and neither the TBVME's nor Dr. Jefferson's live pleadings requested a declaration regarding Dr. Jefferson's compliance with "other laws" or the agency's authority to investigate violations of such "other laws."

Alternatively, the passage should be modified to cure its ambiguity. "The entry of [a] judgment rendered is a formal act, and same should, at least, evidence with clarity and certainty the action taken by the court." *Gen. Exch. Ins. Corp. v. Appling*, 144 S.W.2d 699, 701 (Tex. Civ. App.—El Paso 1940, no writ). Appellate courts have authority to modify ambiguous trial court judgments. *Onoray Davis Truck Co. v. Ford Motor Credit Co.*, 690 S.W.2d 40, 42 (Tex. App.—Houston [14th Dist.] 1985, no writ). "A judgment is ambiguous if it is reasonably susceptible of more than one meaning." *Tate v. King*, No. 03-96-00532-CV, 1997

58

WL 217197, at *1 (Tex. App.—Austin May 1, 1997, no writ) (mem. op.) (not designated for publication). In this case, the trial court's extraneous declaration is not clear as to its meaning or impact on the parties. For example, does the passage declare that the TBVME has authority to prosecute animal-shelter veterinarians for violating "other laws" even under circumstances when the "owner exemption" applies? Or alternatively, that the TBVME has authority to investigate but not prosecute veterinarians for violations of other laws when the exemption applies? Or does it merely acknowledge that veterinarians must comply with "other laws" even though the TBVME has no authority to regulate the area? The passage does not "evidence with clarity and certainty the action taken by the court." *See Gen. Exchange*, 144 S.W.2d at 701.

Finally, to the extent the trial court's extraneous declaration is read to hold that the TBVME has authority to prosecute Dr. Jefferson for violations of "other laws" in her treatment or care of animals owned by San Antonio Pets Alive, then the declaration is erroneous and should be reversed or modified. The agency's enabling statute—the Veterinary Licensing Act—states that the Act "does not apply" in the context of the "owner exemption." *See* TEX. OCC. CODE § 801.004(1). Because agencies have no powers or authority not expressly conferred upon them, *Whiteaker*, 241 S.W.3d at 641, the TBVME has only those powers conferred upon it in the Veterinary Licensing Act. Because the Act "does not

apply" in the context of the "owner exemption," and the TBVME gets all of its authority from the Act, the TBVME necessarily has no authority to prosecute Dr. Jefferson for *any* conduct—in or outside the Veterinary Licensing Act—that is exempted from the agency's jurisdiction by virtue of the "owner exemption."[24]

**PRAYER**

For these reasons, Dr. Jefferson respectfully requests that this Court reverse that part of the trial court's judgment (1) dismissing Dr. Jefferson's UDJA claims for failure to exhaust administrative remedies; (2) denying (or dismissing) Dr. Jefferson's requested mandamus relief; and (3) issuing ambiguous, unrequested, and improper declaratory relief regarding "other laws." Dr. Jefferson requests that the Court render the judgment that the trial court should have rendered, including holding that the TBVME and Oria's disciplinary proceedings against Dr. Jefferson are illegal and *ultra vires*, and issuing injunctive and mandamus relief to stop Oria and the agency from unlawfully disciplining Dr. Jefferson for her care and treatment of animals owned by San Antonio Pets Alive. Alternatively, Dr. Jefferson requests that the Court reverse the trial court's judgment and remand the case to the trial court for consideration of the merits of Dr. Jefferson's UDJA and mandamus claims. Finally, Dr. Jefferson requests that the Court strike or modify

---

[24] The trial court's conclusion of law No. 8, which appears to mirror the extraneous passage in its judgment, is erroneous for the same reasons. *See* 2.CR.38.

the trial court's ambiguous declaration regarding "other laws," and that the Court

issue any such other relief to which she may be entitled in equity or law.

Respectfully submitted,


/s/ Ryan Clinton

Ryan Clinton
State Bar No. 24027934
rdclinton@dgclaw.com
DAVIS, GERALD & CREMER, P.C.
111 Congress Ave., Suite 2800
Austin, Texas 78701
Ph: (512) 537-9938
Fax: (432) 687-1735

David F. Brown
State Bar No.  03108700
dbrown@ebblaw.com
David P. Blanke
State Bar No. 02453600
dblanke@ebblaw.com
EWELL, BROWN & BLANKE, LLP
111 Congress Ave., 28th Floor
Austin, TX 78701
Ph: (512) 457-0233

61

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent this 8th day July, 2015 as follows:

**VIA EFSP & EMAIL**
Mr. Andrew Lutostanski
andrew.lutostanski@texasattorneygeneral.gov
Mr. Ted A. Ross
ted.ross@texasattorneygeneral.gov
Office of the Attorney General of Texas
Administrative Law Division
P. O. Box 12548
Austin, TX 78711

*/s/ Ryan Clinton*
Ryan Clinton

## CERTIFICATE OF COMPLIANCE

Relying on the word count function in the word processing software used to produce this document (Microsoft Word), I certify that the number of words in this brief (excluding the identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, signature, proof of service, certification, certificate of compliance, and appendix) is 13,966  and that the text of the document is in 14-pt. font.  The text of all footnotes is 12-pt.font.

*/s/ Ryan Clinton*

Ryan Clinton

# APPENDIX

Filed in The District Court
of Travis County, Texas

NOV 18 2014

At_____ 10:19_____ A.M.

Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-14-000287

| | | |
|---|---|---|
| ELLEN JEFFERSON, D.V.M., | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | 127th JUDICIAL DISTRICT |
| | § | |
| TEXAS STATE BOARD OF VETERINARY | § | |
| MEDICAL EXAMINERS and NICOLE | § | |
| ORIA, in her official capacity as Executive | § | |
| Director, | § | |
| | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## FINAL JUDGMENT

On August 4, 2014, Plaintiff, Ellen Jefferson, D.V.M. (Dr. Jefferson), and Defendants, the Texas State Board of Veterinary Medical Examiners (TBVME), and Nicole Oria, in her official capacity as Executive Director of TBVME, appeared with their attorneys of record and proceeded to trial before the Court. The Court also heard argument on Defendants' Plea to the Jurisdiction on that date. After considering the pleadings, motions, stipulations, the requests for judicial notice, the evidence presented at trial, and the arguments of counsel, the Court renders final judgment as follows:

The Court grants Defendants' Plea to the Jurisdiction in part and dismisses Dr. Jefferson's claims under the Uniform Declaratory Judgment Act without prejudice. Dr. Jefferson must exhaust her administrative remedies to challenge TBVME's factual findings and allegations and the application of TBVME's rules to those findings and allegations. *See* Tex. Occ. Code Ann. § 801.004(1).

The Court finds that it does have jurisdiction under Section 2001.038 of the Administrative Procedure Act ("APA") regarding certain rule challenges that Dr. Jefferson asserts. The Court finds that TBVME's reliance on Section 2001.038(e) does not bar the Court's consideration of the

EXHIBIT A

administrative rules at the core of the disputes presented in this suit. Under jurisdiction provided by Section 2001.038, the Court finds that the following rules are contrary to Section 801.004(1):

1)      Board Rule 573.72, as written, violates the right of a non-profit or shelter to employ a licensed veterinarian and seek full protection of the ownership exemption for the treatment of their animals for which the shelter is the owner. *See* 22 Tex. Admin. Code § 573.72. If a veterinarian is employed by a non-profit or shelter, their handling of the care of the animals so owned by their employer will not be generally covered by the Act.

2).      Board Rule 573.80(2) also fails to comply with the ownership exemption, since it creates a presumption that a person intends to evade the Act and then provides an impermissibly limited exception that requires the care of a veterinarian to prevent such violation. See 22 Tex. Admin. Code § 573.80(2).

The Court, however, does find that the ownership exception does not allow a veterinarian to ignore other laws outside the Act that relate to his or her veterinary license, including all laws relating to the handling of prescription drugs (dangerous or controlled). Because it is the veterinary license, not the ownership of the animals, that allows a veterinarian to take certain actions, those actions may be overseen by TBVME to ensure compliance. Such investigations and administrative actions are not categorically banned by the ownership exemption and the Court will not prevent TBVME from exercising its administrative powers to investigate such complaints. In exercising its quasi-judicial authority in overseeing the administrative process, however, TBVME must do so in accordance with the boundaries of the Act, and with proper and due regard for the ownership exemption, as mandated by the Texas Legislature.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Plea to the Jurisdiction is granted in part, pursuant to Section 2001.038 of the Administrative Procedure Act; that Board Rules 573.72 and 573.80(2) are found to be contrary to Section 801.004(1) of the

Veterinary Practice Act and therefore invalid; and this matter shall be remanded to the TBVME for further actions consistent with this order.

All costs of court are assessed against the party who incurred them. All relief not expressly granted herein is denied. This judgment finally disposes of all parties and all claims in the entire suit and is appealable.

Signed this _18_ day of November, 2014.

Gisela D. Triana
200th District Court
Travis County, Texas

CAUSE NO. D-1-GN-14-000287

ELLEN JEFFERSON, D.V.M.,           §        IN THE DISTRICT COURT
     Plaintiff,                     §
v.                                 §
                                   §
                                   §
TEXAS STATE BOARD OF               §        TRAVIS COUNTY, TEXAS
VETERINARY MEDICAL EXAMINERS       §
and NICOLE ORIA, in her official capacity §
as Executive Director,             §
     Defendants.                    §        250ᵗʰ JUDICIAL DISTRICT

## Findings of Fact and Conclusions of Law

On August 4, 2014, this case was tried before the court including the Defendants' plea to the jurisdiction. The court signed a Final Take-Nothing Judgment on November 18, 2014. Pursuant to the provisions of Rules 296 through 299 of the Texas Rules of Civil Procedure, and at the request of Plaintiff Ellen Jefferson, D.V.M., ("Dr. Jefferson") the Court hereby enters the following findings of fact and conclusions of law.

Because the Court finds that it generally lacks subject-matter jurisdiction, except for limited issues under Section 2001.038 of the Texas Government Code, only limited findings of facts would be permitted in this case. Such fact issues for which exhaustion of administrative remedies are required include the limitation of the Owner Exemption contained in the Texas Veterinary Licensing Act, Texas Occupations Code Section 801.004(1) ("the Act"), regarding the intent of the licensee.

## Findings of Fact

1. Dr. Jefferson during all relevant times has a Texas veterinary license, and also has been the Executive Director of Austin Pets Alive! ("APA") and President of San Antonio Pets Alive! ("SAPA"), which are related non-profits that act as no-kill animal shelters.

2. While Defendants, Texas State Board of Veterinary Medical Examiners and Nicole Oria, its Executive Director, disputed that Dr. Jefferson was an employee, she was the official agent and director of both non-profits.

3. Defendants, Texas State Board of Veterinary Medical Examiners and Nicole Oria (collectively "the Board"), also attempted early on to dispute that SAPA was the owner of the relevant animals; at the time of trial on the merits and the hearing on the State's plea to the jurisdiction, both SAPA and the City of San Antonio agreed that SAPA was the owner of the animals who were transferred to SAPA from the City's animal control department.

4. The first relevant complaint against Dr. Jefferson involved a citizen who had agreed to foster a pregnant dog for SAPA, following the death of the dog after several days when

*Ellen Jefferson, D.V.M. v. Texas State Board of Veterinary*
*Medical Examiners, et al*
Cause No. D-1-GN-14-000287
Findings of Fact and Conclusions of Law



**EXHIBIT B**

Page 1 of 3

neither Dr. Jefferson nor any other veterinarian examined the dog prior to prescribing various drugs.

5.   Dr. Jefferson was only able to obtain and dispense those drugs because of her possession of her veterinary license.

6.   The drugs that Dr. Jefferson prescribed for the dog were delivered to the foster parent in a manner that may raise concerns about her compliance with the Dangerous Drug Act and other relevant laws, but there is no current jurisdiction in this Court for those issues until all administrative remedies have been properly and timely exhausted, and the Court cannot make further findings or conclusions on those issues.

7.   While the Board are seeking administrative remedies on specific claims, it is clear that the dispute between the Board and Dr. Jefferson (along with APA and SAPA) is not solely limited to those individual claims, but relates to broader policy disputes between the Board, Plaintiff, her shelters, and likely other shelters in the State of Texas; this is apparent from the voluminous nature of the filings and actions during litigation of this current cause by both sides.

8.   All findings of fact that would be more appropriately classified as conclusions of law are hereby adopted as such.

## Conclusions of Law

1.   The Court lacks subject matter jurisdiction in this proceeding except for limited claims asserted under Section 2001.038 of the Texas Government Code; the Court grants Defendants' Plea to the Jurisdiction on all other claims.

2.   Section 2001.038(e) does not prohibit the Court's jurisdiction in this case since the disputes of the parties are no longer limited to individual complaints but have been systematic disputes between the Board and this shelter (and other similar shelters) that may have veterinarians in positions of oversight.

3.   Section 2001.038(e) also does not prohibit the Court's limited jurisdiction in this case to review Board Rules 573.72 and 573.80(2) since the Board's rules does not maintain the proper balance set by the Legislature in the owner exemption, as stated by Section 801.004(1).

4.   Board Rule 573.72, as written, violates the right of a non-profit or shelter to employ a licensed veterinarian and seek full protection of the ownership exemption for the treatment of their animals for which the shelter is the owner. *See* 22 Tex. Admin. Code § 573.72. If a veterinarian is employed by a non-profit or shelter, their handling of the care of the animals so owned by their employer will not be generally covered by the Act or the exception would negate the owner exemption entirely.

*Ellen Jefferson, D.V.M. v. Texas State Board of Veterinary Medical Examiners, et al*
Cause No. D-1-GN-14-000287
Findings of Fact and Conclusions of Law

Page 2 of 3

37

5.  Board Rule 573.80(2) also fails to comply with the ownership exemption, since it creates a presumption that a person intends to evade the Act and then provides an impermissibly limited exception that requires the care of a veterinarian to prevent such violation. See 22 Tex. Admin. Code § 573.80(2). This condition, however, would also legally negate the exemption entirely.

6.  Board Rules 573.72 and 573.80(2) are contrary to Section 801.004(1) of the Act and are invalid.

7.  The Board still has jurisdiction over Dr. Jefferson even if she satisfies the owner exemption, since there remains a fact question in Section 801.004(1) regarding intent, for which the Board is authorized to make initial findings and conclusion.

8.  The Board also has jurisdiction over Dr. Jefferson to ensure that she, as with any veterinarian, complies with other laws that relate to her veterinary license, including all laws relating to the handling of prescription drugs (dangerous or controlled). Because it is the veterinary license, not the ownership of the animals, that allows a veterinarian to take certain actions, those actions may be overseen by the Board to ensure compliance.

9.  The Court dismisses Dr. Jefferson's request for attorney's fees because Section 2001.038 does not provide for an award of attorney's fees.

10. The Court dismisses Dr. Jefferson's claims under the Uniform Declaratory Judgment Act ("UDJA") since that remedy is redundant of the remedies in Section 2001.038 and therefore there is no jurisdiction under the UDJA for the suit.

11. All conclusions of law that would be more appropriately classified as findings of fact are hereby adopted as such.

Signed on the 19th day of December, 2014.

_Gisela D. Triana_
Gisela D. Triana
Judge, 200th District Court
Travis County, Texas

*Ellen Jefferson, D.V.M. v. Texas State Board of Veterinary*
*Medical Examiners, et al*
**Cause No. D-1-GN-14-000287**
**Findings of Fact and Conclusions of Law**

Page 3 of 3

38

Vernon's Texas Statutes and Codes Annotated
  Occupations Code (Refs & Annos)
    Title 4. Professions Related to Animals (Refs & Annos)
      Chapter 801. Veterinarians (Refs & Annos)
        Subchapter A. General Provisions

V.T.C.A., Occupations Code § 801.004

§ 801.004. Application of Chapter

Effective: September 1, 2011
Currentness

This chapter does not apply to:

(1) the treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal, unless the ownership, employment, or designation is established with the intent to violate this chapter;

(2) a person who performs an act prescribed by the board as an accepted livestock management practice, including:

(A) castrating a male animal raised for human consumption;

(B) docking or earmarking an animal raised for human consumption;

(C) dehorning cattle;

(D) aiding in the nonsurgical birth process of a large animal, as defined by board rule;

(E) treating an animal for disease prevention with a nonprescription medicine or vaccine;

(F) branding or identifying an animal in any manner;

(G) artificially inseminating an animal, including training, inseminating, and compensating for services related to artificial insemination; and

(H) shoeing a horse;

(3) the performance of a cosmetic or production technique to reduce injury in poultry intended for human consumption;

EXHIBIT C

(4) the performance of a duty by a veterinarian's employee if:

(A) the duty involves food production animals;

(B) the duty does not involve diagnosis, prescription, or surgery;

(C) the employee is under the direction and general supervision of the veterinarian; and

(D) the veterinarian is responsible for the employee's performance;

(5) the performance of an act by a person who is a full-time student of an accredited college of veterinary medicine if the act is performed under the direct supervision of a veterinarian;

(6) an animal shelter employee who performs euthanasia in the course and scope of the person's employment if the person has successfully completed training in accordance with Chapter 829, Health and Safety Code;

(7) a person who is engaged in a recognized state-federal cooperative disease eradication or control program or an external parasite control program while the person is performing official duties required by the program;

(8) a person who, without expectation of compensation, provides emergency care in an emergency or disaster; or

(9) a consultation given to a veterinarian in this state by a person who:

(A) resides in another state; and

(B) is lawfully qualified to practice veterinary medicine under the laws of that state.

**Credits**

Acts 1999, 76th Leg., ch. 388, § 1, eff. Sept. 1, 1999. Amended by Acts 2007, 80th Leg., ch. 1331, § 4, eff. Sept. 1, 2007; Acts 2011, 82nd Leg., ch. 411 (S.B. 811), § 1, eff. Sept. 1, 2011.

V. T. C. A., Occupations Code § 801.004, TX OCC § 801.004
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.



# BOARD NOTES



PLAINTIFF'S
EXHIBIT
18

Fall 2012 Issue
Phone: (512) 305-7555

*A Publication of the Texas State Board of Veterinary Medical Examiners*
E-Mail: vet.board@tbvme.state.tx.us   Website: http://www.tbvme.state.tx.us

Nicole Oria, Executive Director
Fax: (512) 305-7556

Bud E. Alldredge, Jr., DVM, President
Richard "Rick" Bonner
Joe Mac King, DVM

David Rosberg, Jr., DVM , Vice President
Janie Carpenter, DVM
Manuela "Mamie" Salazar-Harper

J. Todd Henry, DVM, Secretary
John D. Clader, DVM
Chad Upham

## FROM THE EXECUTIVE DIRECTOR

### Creation of Veterinarian-Client-Patient Relationships at Shelters

There has been much discussion of this topic at many of the veterinary meetings I have attended recently. The creation of a valid veterinarian-client-patient relationship is at the heart of the veterinary profession. So much so, it is set out clearly in the Veterinary Licensing Act, Chapter 801 of the Occupations Code, Section 801.351:

(a) A person may not practice veterinary medicine unless a veterinarian-client-patient relationship exists. A veterinarian-client-patient relationship exists if the veterinarian:

(1) assumes responsibility for medical judgments regarding the health of an animal and a client, who is the owner or other caretaker of the animal, agrees to follow the veterinarian's instructions;

**(2) possesses sufficient knowledge of the animal** to initiate at least a general or preliminary diagnosis of the animal's medical condition; and

(3) is readily available to provide, or has provided, follow-up medical care in the event of an adverse reaction to, or failure of, the regimen of therapy provided by the veterinarian.

**(b)  A veterinarian possesses sufficient knowledge of the animal for purposes of Subsection (a) (2) if the veterinarian has recently seen, or is personally acquainted with, the keeping and care of the animal by:**

**(1) Examining the animal; or**

**(2) Making medically appropriate and timely visits to the premises on which the animal is kept.**

(c) A veterinarian-client-patient relationship may not be established by telephone or electronic means.

*Continued on page 2...*

**IN THIS ISSUE...**

| | | | |
|---|---|---|---|
| *From the Executive Director* | *1* | *Licensing Exam Dates and Continuing Education Offerings* | *3* |
| *Enforcement Issues* | *4* | *Board Meeting Date* | *5* |
| *Confirmed Anthrax Case* | *6* | *In Memoriam* | *6* |
| *Email Renewal Reminders* | *7* | *Prescription Access in Texas* | *9* |
| *Board Adopted Rule Changes* | *9* | *Board Proposed Rule Changes* | *10* |

EJ 000637



**EXHIBIT D**

*Continued from Page 1...*

The Board has always stated that an examination is required to establish a veterinarian-client-patient relationship. Section (b)(2) was placed within the statute for herd livestock management. The example contemplated by that language was a livestock feedlot where the veterinarian makes medically appropriate and timely visits to the premises on which the animal is kept. This subsection does not apply to shelters in the initial presentation of the animal at the shelter as the veterinarian had not previously made medically appropriate and timely visits to the premises on which the animal was kept prior to arriving at the shelter. In fact, the shelter veterinarian does not know where the premises was where the animal was kept. After the time period for holding the animal has elapsed, usually three days and set by local ordinance, then the shelter may claim the animal is abandoned and the shelter is the owner. Under Texas law, an animal's owner or a caretaker designated by the owner can perform acts of veterinary medicine on the animal without involving a veterinarian and without concern for establishing a veterinarian-client-patient relationship, because the owners and caretakers are exempt from the Veterinary Licensing Act. Until that point, in order to perform any veterinary services on that animal, including rabies vaccinations, a veterinarian must conduct an examination on that animal to establish a veterinarian-client-patient relationship.

**The Board does not define an examination, but the Board's rule on maintaining the standard of care, Section 573.22, and the Board's rule on recordkeeping, Section 573.52, Title 22, Part 24 of the Texas Administrative Code, still apply.** The examination must be sufficient to satisfy an average member of the local veterinary medical community that the animal is healthy enough for the prescribed treatment. A record of the examination and the information required under the recordkeeping rule to substantiate the examination is necessary no matter whether the animal is vaccinated at a shelter, a low-cost vaccination clinic or a private clinic.

The purpose of the examination, especially in the vaccination scenario, is to ensure the animal is not sick. If a vaccination is given to a sick animal, the vaccination may not be effective. This is extremely important with the rabies vaccination, in the control of zoonotic diseases.

Under Section 826.047 of the Health and Safety Code, a veterinarian performing duties under this chapter (Rabies) is not liable to the owner of an animal for the death of or injury to the animal except in the case of willful misconduct or gross negligence. This would apply in a civil suit for damages if the animal died when the veterinarian was performing duties as part of rabies vaccinations, registration, restraint and impoundment of animals. This does not address the problem of a veterinarian failing to uphold the Veterinary Licensing act and the Board's Rules of Professional Conduct by failing to establish a veterinarian-client-patient relationship prior to performing veterinary services on the animal, including vaccinating for rabies, by failing to uphold the standard of care by not examining an animal prior to treatment, or by failing to record details that substantiate the examination.

**There has been no change to either the statute, any rules regarding this matter or the Board's interpretation of the Act or rules.**

EJ 000638

# LICENSING EXAM DATES

### 2012 STATE BOARD EXAMINATION (SBE) SCHEDULE

All State Board Exams will be administered at participating ACT testing centers. Please read the deadline dates carefully. An application must be submitted to TBVME for ALL exams to determine eligibility for veterinary licensure in Texas.

Only approved applicants will be able to purchase and schedule the exam.

**October 2012**
Deadline for application to be received by TBVME: August 24, 2012
Window for purchasing and scheduling exam: September 1st – 17th, 2012
Window for taking the exam: October 8th – 19th, 2012

**December 2012**
Deadline for application to be received by TBVME: October 19, 2012
Window for purchasing and scheduling exam: November 1st – 19th, 2012
Window for taking the exam: December 3rd – 14th, 2012



## CONTINUING EDUCATION OFFERINGS

*Information on available CE may be obtained through the following sources. Additional offerings may be available through other sources.*

| *RACE*<br>*(Registry of Approved Continuing Education)*<br>Search for Available CE:<br>http://www.aavsb.org/RACE/RaceSearch.asp | *Texas A&M*<br>Phone: (979) 845-9102<br>Fax: (979) 862-2832<br>Email: ceoffice@cvm.tamu.edu |
| --- | --- |
| RACE requires approved providers to issue signed certificates of completion, maintain attendance records for four years and provide qualification of instructors and CE personnel who develop and implement courses. | *Texas Veterinary Medical Association*<br>www.tvma.org<br>8104 Exchange Dr.<br>Austin, TX 78754<br>Phone: (512) 452-4224<br>Fax: (512) 452-6633 |

EJ 000639

# ENFORCEMENT ISSUES

## DISCIPLINARY ACTIONS

The following veterinarians have had disciplinary action taken against their licenses. If you would like to receive additional information regarding these or other disciplinary actions that have been imposed, please send your written request to the Texas Board of Veterinary Medical Examiners, ATTN: Open Records, 333 Guadalupe, Suite 3-810, Austin, TX 78701 or by email to vet.board@tbvme.state.tx.us.

| Name | License # | City | Discipline | Date of Action |
|------|-----------|------|------------|----------------|
| Jess Adkins, DVM | 3046 | Fairfield | Formal Reprimand with Additional Stipulations | July 24, 2012 |
| James Cox, DVM | 5254 | Sugarland | Formal Reprimand with Additional Stipulations | July 24, 2012 |
| Debra Garrison, DVM | 4941 | Spring | Formal Reprimand with Additional Stipulations | July 24, 2012 |
| James Gibbs, DVM | 2606 | Brownsboro | Voluntary Surrender of License in Lieu of Penalties | July 24, 2012 |
| Sarah Graham, DVM | 4956 | San Antonio | Formal Reprimand with Additional Stipulations | July 24, 2012 |
| Rohn Hendricks, DVM | 7002 | Waxahachie | Formal Reprimand with Additional Stipulations | July 24, 2012 |
| Diana Magee, DVM | 11595 | Monterey, CA | Voluntary Surrender of License without Reinstatement for 5 Years | July 24, 2012 |
| Ali Rohani, DVM | 9257 | Allen | Formal Reprimand with Additional Stipulations | July 24, 2012 |
| Eddy Soranaka, DVM | 10768 | Ft. Hood | Formal Reprimand with Additional Stipulations | July 24, 2012 |
| Kelli Shomette, DVM | 7460 | Wylie | Formal Reprimand with Additional Stipulations | July 24, 2012 |

## CEASE & DESIST ORDERS

The following Cease & Desist Orders have been signed and approved by the Board. If you would like to receive additional information regarding these or other disciplinary actions that have been imposed, please send your written request to the Texas Board of Veterinary Medical Examiners, ATTN: Open Records, 333 Guadalupe, Suite 3-810, Austin, TX 78701 or by email to vet.board@tbvme.state.tx.us.

| Name | City | Date of Action |
|------|------|----------------|
| Mike Grimes | Palmer | July 24, 2012 |
| Lisa Kronz | Garland | July 24, 2012 |
| Sheba Shechem-Bethel | Woodside, NY | July 24, 2012 |
| Robert Tieperman | Midway | July 24, 2012 |
| Janet Walsdorf dba Alamo Heights Kennel Club | San Antonio | Jylu 24, 2012 |
| Brandon White | Alba | July 24, 2012 |

EJ 000640

*Disciplinary Actions continued...*

In addition to the formal reprimands listed previously there were an additional 72 actions taken against veterinarians. If you would like to receive additional information regarding these or other disciplinary actions that have been imposed, please send your written request to the Texas Board of Veterinary Medical Examiners, ATTN: Open Records. 333 Guadalupe, Suite 3-810, Austin, TX 78701 or by email to vet.board@tbvme.state.tx.us.

| Number of Licensees Disciplined | Violation Type | Sanction |
|---|---|---|
| 6 | Continuing Education | Administrative penalties and additional continuing education |
| 4 | Misuse of DEA/DPS Registration | Administrative penalties |
| 1 | Responsibility for Acceptance of Medical Care | Informal reprimand |
| 1 | Display of License | Informal reprimand and administrative penalty |
| 1 | Rabies Control | Informal reprimand |
| 1 | Adherence to Law | Informal reprimand, jurisprudence exam and administrative penalty |
| 1 | Alternate Therapies | Informal reprimand, jurisprudence exam and administrative penalty |
| 1 | Use of Prescription Drugs | Informal reprimand, jurisprudence exam and administrative penalty |



**Board Meeting Dates***

October 30, 2012

*This date is not official until posted with the Secretary of State.



_On Memoriam..._

_"Let us hold our lives up to the light of those who walked before us, remembering the footprints they left behind and preserving the pathways they created."_

Jack Fritts , 'Texas A&M Class of '53

| Name | City, State | Vet. School/Grad. Year | Date of Death |
|------|-------------|------------------------|---------------|
| Melvin Calliham | College Station, Texas | TAMU/1949 | 8/19/2012 |
| Bobby J. Cargill | Bryan, Texas | TAMU/1960 | 9/19/2012 |
| Raymond Ivie | Follett, Texas | TAMU/1945 | 9/15/2012 |
| Ed B. Avery | Kendalia, Texas | TAMU/1959 | 9/30/2012 |
| E.Byron Range, Jr. | Big Spring, Texas | TAMU/1951 | 10/2/2012 |

# ANTHRAX CASE CONFIRMED IN SHEEP IN IRION COUNTY

**AUSTIN** - A yearling female sheep in West Texas has been diagnosed with anthrax. This is the second confirmed case of anthrax in a Texas animal for 2012 and the first in livestock this year. The infected sheep was located near Mertzon, TX (Irion County,) which is approximately 26 miles southwest of San Angelo. The Texas Animal Health Commission (TAHC) has quarantined the premises. TAHC regulations require vaccinations of exposed livestock and proper disposal of carcasses before a quarantine can be released.

Anthrax is a bacterial disease caused by _Bacillus anthracis,_ which is a naturally occurring organism with worldwide distribution, including Texas. It is not uncommon for anthrax to be diagnosed in livestock or wildlife in the southwestern part of the state. Basic sanitation precautions such as hand washing, wearing long sleeves and gloves can prevent accidental spread of the bacteria to people if handling affected livestock or carcasses.

Acute fever followed by rapid death with bleeding from body openings are all common signs of anthrax in livestock. Carcasses may also appear bloated and appear to decompose quickly. Livestock or animals displaying symptoms consistent with anthrax should be reported to a private practitioner or TAHC official.

"The TAHC will continue to closely monitor the situation for possible new cases across the state. Producers are encouraged to consult with their veterinary practitioner or local TAHC office about the disease and about preventative measures such as vaccination of livestock," Dr. Dee Ellis, State Veterinarian, said.

For more information regarding anthrax, contact your local TAHC region or 1-800-550-8242 or visit www.tahc.state.tx.us.

The Texas Animal Health Commission works to protect the health of all Texas livestock, including: cattle, swine, poultry, sheep, goats, equine animals, and exotic livestock.

EJ 000642



★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★

## Our Mission:

The mission of the Texas State Board of Veterinary Medical Examiners is to establish and enforce policies to ensure the best possible quality of veterinary services for the people of Texas.

## Our Goals:

The Board and its staff will ensure that Texans are effectively and efficiently served by quality veterinary professionals by setting clear standards for professional conduct, by assuring compliance with the rules of professional conduct and the community standard of care, and seeking solutions to issues that strengthen the profession and protect the public.

★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★★




# EMAIL RENEWAL REMINDERS

Over the years, numerous licensees have commented that it would be nice to receive an email reminder about their renewal either in place of or in addition to the postcards that we send out in January of each year. Up until now, we have not had the capability to do this, but we are happy to announce that with the 2013 renewals, we will begin sending an email reminder to all licensees who provide us with an email address. This will be in addition to the postcards that will be mailed out at the same time.

We will also use this new feature to send a link when a new issue of the newsletter, *Board Notes,* is available. For any other important information that licensees should be made aware of, an email will also be sent. Please make sure that we have a current email address for you so that you will receive these email notifications.

| DID YOU KNOW??? | PEER ASSISTANCE |
|---|---|
| • Unless you owe for more than the current year, all licensees can renew their license online through our website. | If you or someone you know has a substance abuse problem, it is far better to voluntarily participate in the Peer Assistance Program than to run the risk of disciplinary action, up to and including license revocation. The toll free hotline number is 1-800-727-5152. |
| *The TBVME does not discriminate on the basis of race, color, religion, sex, national origin, age or disability in employment or in the provision of services, programs or activities. Individuals requiring reasonable accommodations should contact the agency's ADA Coordinator at 333 Guadalupe, Suite 3-810, Austin, TX 78701-3998, or call (512) 305-7555 or 1-800-877-8973 (TDD). This document may be requested in alternative formats by contacting the Board offices.* | **ADA ACCOMODATIONS** <br><br> Individuals seeking ADA accommodations should contact the Board's ADA Coordinator, Loris Jones, at 512/305-7555 or by email at loris.jones@tbvme.state.tx.us. |

EJ 000643

# FROM THE TEXAS DEPARTMENT OF PUBLIC SAFETY

## PRESCRIPTION ACCESS IN TEXAS

Dear Dental and Veterinary Professionals,

In keeping with the agency goal of providing world-class services, the Texas Department of Public Safety (DPS), Regulatory Services Division (RSD) is proud to provide Prescription Access in Texas (PAT), a secure online prescription monitoring program, which will assist our Texas health care and law enforcement professionals in quickly identifying potential prescription drug abuse. PAT provides controlled substance prescription dispensing history to authorized dental and veterinary professionals, and dental and veterinary board investigators.

We encourage you to search the last 365-days worth of data, 24-hours a day, seven days a week, including:

- Patient prescription history
- Physician's own prescribing information

The Texas Prescription Program was created by the Texas Legislature to monitor Schedule II - V controlled substances. Texas Health & Safety Code, Chapter 481, restricts access to prescription data to practitioners and pharmacists who are inquiring about their patients, and to various regulatory and law enforcement personnel conducting investigations.

Future enhancements will include pharmacy dispensing summary report for the pharmacist-in-charge (PIC).

DPS continues to take great pride in serving the citizens of Texas by combating terrorism and crime, enhancing public safety, strengthening statewide emergency management and providing world-class services.

**Steven C. McCraw**
Director, DPS

**RenEarl Bowie**
Director, RSD

**URL:** Prescription Access in Texas (PAT) | https://www.texaspatx.com/Login.aspx
**Press Release:** http://www.dps.texas.gov/director_staff/public_information/pr080212.htm

**EJ 000644**

# BOARD ADOPTS CHANGES TO RULES

At the July 24, 2012 Board meeting, the Board voted to adopt the following rules. The adoption was published in the August 17, 2012 issue of the *Texas Register*. The full text of the rules can be found on the agency website http://www.tbvme.state.tx.us/rules.php.

**Rule §575.25  Recommended Schedule of Sanctions.**
The adopted amendments to §575.25 are intended to make the schedule of disciplinary sanctions apply to all licensees, veterinarians and equine dental providers alike. These amendments are necessitated by House Bill (HB) 414, 82nd Legislative Session, which gave the Board the authority to license and regulate equine dental providers.

**Rule §575.28  Complaints--Investigations**
The Board adopts amendments to §575.28 to clarify the Board's procedure for investigating complaints by specifying the information the Board sends to respondent licensees during the course of an investigation in light of confusion among licensees and members of the public regarding the scope and meaning of the word "complaint."

The Board has traditionally interpreted "complaint" in §575.28(6) to refer only to the written narrative allegations submitted by a complainant on the Board's complaint form. The Board does not disclose to the respondent licensee any other documents submitted by the complainant at the earliest stages of the investigation process, before the respondent licensee has sent the Board his records and explained his response to the allegations against him. To preserve this process, and with it the integrity of the Board's investigations, the adopted amendment provides that the Board will send a summary of the allegations in the complaint to the respondent licensee initially with a request for a response. Under the adopted amendment, the respondent licensee has the right to request to review the entire complaint—meaning all documents or materials provided to the Board by a complainant and upon which the Board initiates a request for a response from the licensee— unless board staff determines that allowing the respondent licensee to review the complaint in its entirety would jeopardize an active investigation, as could be the case with certain documents such as investigative files from other state and federal agencies, second opinions from other licensees or specialists, and copies of patient records attached to or included with the complaint form. Accordingly, under the adopted amendment when the complainant responds to the respondent licensee's response, board staff will have the discretion to withhold from the respondent any materials submitted by the complainant that could jeopardize the investigation. These changes are intended to preserve the Board's ability to learn the respondent licensee's version of events without suggestion or influence from outside sources; this ability is a vital tool for board investigators seeking the truth.

The Board also adopts amendments to §575.28 that allow any member of Board staff to investigate a complaint, where previously only board investigators could investigate. The Board intends the amendment to give the Director of Enforcement more latitude in assigning investigation duties by allowing her to assign complaint investigations to administrative staff, as well as to investigators on staff, depending on the complexity of the case.

EJ 000645

*Continued from page 9...*

The Board has also adopted an amendment to §575.28 to close an inefficient redundancy in the investigation process, which required the executive director to review all complaints that do not involve medical judgment twice —once in an initial solitary review, and again as part of the staff committee. The rule, as amended, allows the director of enforcement to refer a report of investigation for a probable violation that does not involve medical judgment directly to the staff committee. As a member of the staff committee—which is composed of the executive director, the director of enforcement, the investigating staff member and the general counsel—the executive director will still review the case and take part in deciding whether the case should go forward.

### Rule §577.16  Responsibilities of Board and Staff
The Board adopts the amendment to §577.16 to include equine dentistry along with veterinary medicine as professions that the Board is responsible for regulating under the Veterinary Licensing Act. The amendment is necessitated by House Bill (HB) 414, 82nd Legislative Session, which gave the Board the authority to license and regulate equine dental providers.

## BOARD PROPOSES CHANGES TO RULES

At the July 24, 2012 Board meeting, the Board directed staff to post the following proposed changes in the *Texas Register* for comment, the full text of the changes can be found on the agency website.

### Rule §573.10  Supervision of Non-Licensed Persons
The proposed amendment to §573.10 is intended to correct errors in subsection (h) to clarify the duties and practice limitations of Registered Veterinary Technicians.

The Board also proposes the amendment to §573.10 to create cross-references and remove redundancies with new proposed §573.19, regarding dentistry, which is also proposed in this issue of the Texas Register. In the proposed amendment to §573.10, the subsection that previously described the scope of practice for licensed equine dental providers has been removed from §573.10 and relocated to proposed new §573.19, so that all of the Board's rules regarding dentistry are consolidated to appear together in new proposed §573.19.

### Rule §573.19  Dentistry
The proposed new rule defines dentistry, a term which is used in §801.002(7) of the Veterinary Practice Act, Texas Occupations Code, in the definition of "veterinary medicine" as "veterinary surgery, reproduction and obstetrics, dentistry, ophthalmology, dermatology, cardiology, and any other discipline or specialty of veterinary medicine." Under §801.251 of the Veterinary Practice Act, "a person may not practice, or offer or attempt to practice, veterinary medicine unless the person holds a license to practice veterinary medicine issued under this chapter." Thus, the Veterinary Licensing Act holds that an unlicensed person may not practice dentistry on an animal in Texas. The Veterinary Licensing Act does not, however, define "dentistry," so the Board intends proposed new §573.19 to provide that definition.

EJ 000646

*Continued from page 10...*

The Board proposes the definition of dentistry with the intention to allow unlicensed individuals to brush teeth of animals and superficially clean the teeth of animals with gauze, cotton swabs, or dental floss, while preventing unlicensed individuals that are not employed and supervised by a veterinarian from performing any other more invasive treatment on an animal's teeth or gums, including but not limited to using a periodontal scaler on animal teeth to remove plaque or tartar.

It is important to note that an unlicensed employee of a veterinarian working under appropriate veterinary supervision can still perform tooth cleanings and other dental services under proposed new §573.19, with the exception of invasive dental procedures as defined under 573.80— procedures that expose the dental pulp and dental extractions. The Board does not intend proposed new §573.19 to have any impact on the procedures that an employee of a veterinarian can perform under veterinary supervision.

The Board also proposes new §573.19 to consolidate the Board's rules regarding dentistry into a single rule for clarity and ease of reference for both licensees and the general public. Proposed new §573.19 therefore includes a subsection describing the scope of practice for equine dental providers that previously appeared in §573.10, regarding the supervision of non-licensed persons. The Board has proposed a parallel amendment to §573.10, which is also published in this issue of the Texas Register, to remove the subsection on the scope of practice for equine dental providers and to create cross-references to proposed new §573.19. In the interests of clarity, proposed new §573.19 also references the prohibition that appears in §573.10 forbidding unlicensed persons from performing any invasive dental procedure as defined under §573.80, regarding definitions.

### Rule §573.43  Controlled Substances Registration
The Board has recently encountered situations in which veterinarians were exempt from the requirement to obtain a controlled substance registration under either Texas Department of Public Safety (DPS) or United States Drug Enforcement Agency (DEA) rules and laws, but were concerned that they still had to obtain a controlled substance registration nevertheless in order to comply with §573.43. The Board does not intend its controlled substances registration requirements to be more stringent than that of DEA or DPS. The Board therefore proposes an amendment to §573.43 to clarify that a veterinarian does not need to have a controlled substances registration from either DPS or DEA if that registration is not required by other state or federal law.

The Board also proposes an amendment to §573.43 to correct an error in subsection (b), adding the word "substances" where it was inadvertently not included, so that the phrase now reads "to dispense controlled substances." This is not intended to alter the meaning of the rule.

### Rule §573.71  Operation of Temporary Limited-Service Veterinary Services
In recent years, the Board has requested additional information from veterinarians applying to operate a temporary limited-service veterinary service, beyond the categories of information required under §573.71. The Board proposes an amendment to §573.71 to make this additional requested information required by rule, and thereby to make the rule accurately reflect current Board procedure.

### Rule §573.80  Definitions
The Board proposes the amendment to §573.80 to correct a typographical error in paragraph (10), adding the prefix "non" to "veterinarian" so that the sentence reads: "Immediate Supervision--a veterinarian required to immediately supervise a non-veterinarian must be within audible and visual range of both the animal patient and the person under supervision." This change does not alter the Board's interpretation of the meaning of "Immediate Supervision."

EJ 000647

*Continued from page 11...*

### Rule §577.15  Fee Schedule

The Board proposes the amendment to §577.15 to reformat the fees to make them easier to read, to adjust veterinarian renewal fees lower to match current legislative appropriations for the 2013 fiscal year, to correct a calculation mistake in the fee for provisional veterinary licenses, to add inactive equine dental provider fees necessitated by rule changes that created inactive status for equine dental provider licensees, and to consolidate all the fixed fees that the Board charges into one schedule.

In the proposed rule, the application processing fees and examination fees, which appeared as separate line items for each initial license in the previous version of the rule, have been consolidated into the respective initial licenses, and no longer appear as separate fees. The Board proposes this change to clarify the cost of becoming initially licensed in Texas as either a veterinarian or an equine dental provider.

With regard to veterinary licenses, the proposed rule decreases veterinary license renewal fees to match the appropriations granted to the agency. The proposed rule increases the fee for provisional veterinary licenses that makes the provisional license $50 more expensive than a regular veterinary license, to more accurately reflect the costs and staff time involved in processing and administering the two separate examinations that provisional licensees take on their way to becoming full licensees.

With regard to the new inactive fees for equine dental providers, the proposed amendment adds renewal fees and inactive status fees to the fee schedule so that in fiscal year 2013, equine dental providers who became licensed for the first time in fiscal year 2012 will have the option to renew their licenses or put their licenses on inactive status. The Equine Dental Provider Advisory Committee has reviewed these proposed fees and found by consensus that the proposed fees for equine dental provider licenses are reasonable.

The proposed amendment adds several fees to the fee schedule that previously appeared in other rules, such as the fee for duplication of license, and the reactivation fees for both veterinary and equine dental provider licenses. With the addition of these fees, the Board intends for this rule to reflect all of the fixed fees that the Board charges. It does not, however, reflect variable fees that the Board has set, such as the fees for transcripts and records of administrative hearings before the State Office of Administrative Hearings as set forth in §575.10 of this title (relating to Costs of Administrative Hearings).

## UPCOMING OFFICE HOLIDAY CLOSURES

November 22—23, 2012 in observance of the Thanksgiving Holiday.
December 24—26, 2012 in observance of the Christmas Holiday
January 1, 2013 in observance of the New Year Holiday

EJ 000648

## NOTICE OF ADDRESS CHANGE

Please email, fax, or mail to:
> Texas Board of Veterinary Medical Examiners
> 333 Guadalupe, Suite 3-810
> Austin, Texas 78701
> FAX: 512-305-7556
> Email: vet.board@tbvme.state.tx.us

*Please print or type*

Name _____

License Number _____

**Mailing Address:**
Street/PO Box _____

City, State _____ Zip Code _____

Email _____

**Practice Address:**
Practice Name _____

Street _____

City, State _____ Zip Code _____

Phone _____ Fax _____

Email _____

**Home Address:**
Street _____

City, State _____ Zip Code _____

Home Phone _____ Cell Phone _____

Email _____

<u>**Note:**</u> The mailing address is the default address. All documents, forms and letters sent to you from this agency will be mailed to this address.

The mailing address is printed on your license renewal certificate. If you have changed your mailing address and need a duplicate renewal certificate, please indicate below.

_____ Please send a duplicate renewal certificate.

*Pursuant to Board Rule 573.76(a) "A veterinarian shall notify the Board of any change of any items in subsection (a) not later than the 60th day after the change takes place." Subsection (a) includes: name and license number; clinic or practice name; physical business address; mailing address; residence address; business telephone number; and residence and/or cellular telephone number.*

**EJ 000649**

# NOTICE TO CLIENTS

To file a commendation or grievance concerning a veterinarian, please contact:

## Texas Board of Veterinary Medical Examiners
333 Guadalupe, Tower 3, Suite 810
Austin, Texas 78701-3942
Phone: (512) 305-7555
Fax: (512) 305-7556

To obtain information about filing a complaint, you may access the Board's voicemail 24 hours a day by calling toll free: 1-800-821-3205

EJ 000650

# STATE OFFICE OF ADMINISTRATIVE HEARINGS

### AUSTIN OFFICE
**300 West 15th Street Suite 502**
**Austin, Texas 78701**
**Phone: (512) 475-4993**
**Fax: (512) 322-2061**

DATE:                                                                                      **2/25/2015**

NUMBER OF PAGES INCLUDING THIS COVER SHEET:                                **18**

REGARDING:          **ORDER NO. 9 - RULING ON EXEMPTION QUESTION AND REQUIRING THE PARTIES TO CONFER**

DOCKET NUMBER:                                                              **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**

                                                                    **JUDGE SHANNON KILGORE**

| **FAX TO:** | **FAX TO:** |
|---|---|
| DAVID F. BROWN | (877) 851-6384 |
| JONATHAN CRABTREE (TEXAS BOARD OF VETERINARY MEDICAL EXAMINERS) | (512) 305-7574 |

**xc: Docket Clerk, State Office of Administrative Hearings**
**NOTE: IF ALL PAGES ARE NOT RECEIVED, PLEASE CONTACT ANGELA PARDO(apa) (512) 475-4993**

The information contained in this facsimile message is privileged and confidential information intended only for the use of the above-named recipient(s) or the individual or agent responsible to deliver it to the intended recipient. You are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone, and return the original message to us at the address via the U.S. Postal Service. Thank you.

**EXHIBIT E**

**SOAH DOCKET NO. 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**

| | | |
|---|---|---|
| **TEXAS BOARD OF VETERINARY** | § | **BEFORE THE STATE OFFICE** |
| **MEDICAL EXAMINERS** | § | |
| | § | **OF** |
| **v.** | § | |
| | § | |
| **ELLEN JEFFERSON, D.V.M.** | § | **ADMINISTRATIVE HEARINGS** |

**ORDER NO. 9**
**RULING ON EXEMPTION QUESTION AND**
**REQUIRING THE PARTIES TO CONFER**

**I. PROCEDURAL HISTORY**

This is an enforcement case brought by the staff (Staff) of the Texas Board of Veterinary Medical Examiners (Board) against Ellen Jefferson, D.V.M. (Dr. Jefferson or Respondent). Dr. Jefferson, a licensed veterinarian, is a board member and the executive director of San Antonio Pets Alive! (SAPA), a nonprofit animal rescue organization. Staff alleges that Dr. Jefferson, in her work connected with SAPA, violated: the Veterinary Licensing Act (VLA);[1] the Board's rules at title 22, chapter 573 of the Texas Administrative Code; and the Texas Dangerous Drug Act (DDA).[2] Claiming a statutory exemption from the Board's authority, Dr. Jefferson filed a Plea to the Jurisdiction Or, in the Alternative, Motion for Summary Disposition.

On December 9, 2014, the undersigned Administrative Law Judge (ALJ) convened an evidentiary hearing solely concerning the threshold question of whether the alleged acts and omissions of Dr. Jefferson were exempt from enforcement by the Board.[3] This order determines that Dr. Jefferson's conduct was exempt from the Board's enforcement with respect to most, but not all, of the allegations in this case.

---

[1] Tex. Occ. Code ch. 801.

[2] Tex. Health & Safety Code ch. 483.

[3] Both parties filed final briefs on the exemption issue on January 16, 2015.

Although the ALJ is persuaded, in large part, by Respondent's exemption argument, the ALJ does not believe that either dismissal for want of jurisdiction or summary disposition is the appropriate procedural approach.[4] Instead, the ALJ is issuing this order explaining why Dr. Jefferson's actions were exempt from discipline under the VLA with respect to many of the allegations in Staff's pleading. As to those allegations, no further fact finding is necessary. As to the remaining portion of the case, to which the exemption does not apply, adjudication—involving further presentation of evidence—is required. Accordingly, the ALJ will convene the remainder of the hearing and then issue a proposal for decision that incorporates the findings and analysis addressed in this order related to the exemption issue, as well as the issues that have yet to be heard. At the end of this order are instructions to the parties concerning setting a hearing date.

## II. SAPA

The City of San Antonio transfers stray and abandoned dogs and cats to SAPA's ownership after the city has become the owner of the animals by operation of law and the animals are designated for euthanasia. SAPA then becomes the owner of the animals, caring for them (in SAPA shelter facilities or through temporary, volunteer foster families) until the animals' placement with permanent adoptive families.[5] Dr. Jefferson is the lead veterinarian at SAPA.

At the time of the events at issue in this case, SAPA had two contract veterinarians working part-time, as well as three veterinary technicians.[6] Dr. Jefferson was on-call twenty-

---

[4] Summary disposition is not appropriate because the question of the application of the exemption involves disputed facts, which is why an evidentiary hearing on the exemption question was required. *See* 1 Tex. Admin. Code § 155.505(a) ("Summary disposition shall be granted on all or part of a contested case if the pleadings, the motion for summary disposition, and the summary disposition evidence show that there is no genuine issue as to any material fact . . . ."). Dismissal is not the preferred option because it deprives the Board of the opportunity to consider the legal issues involved in the exemption analysis.

[5] Pet. Exs. 7, 21; Resp. Exs. 5-6, 70. The City of San Antonio has stated that the animals SAPA rescues from the City's shelter "are permanent transfers to SAPA and its leader, Ellen Jefferson, D.V.M." Pet. Ex. 7 at 2.

[6] Pet. Ex. 21 at 2.

four hours per day, seven days per week.[7] To address the veterinary needs of the SAPA rescue animals, SAPA used a triage system, described by Dr. Jefferson as follows:

> All animals are picked up from our clinic before going to foster. They are evaluated by clinic staff before they are sent to foster homes and any illnesses or conditions that may warrant medical treatment are brought to the attention of a veterinarian, either as soon as the condition is noted or the next time a veterinarian is present. Alternatively, clinic staff has the additional option of contacting me directly regarding the condition of any animal. The City shelter veterinarians will often help triage more complicated cases if the SAPA! vet is not there, as we share the same compound.
>
> For animals in foster, we have foster liaisons who answer emails as volunteers at fostermedical@sanantoniopetsalive.org. Although these volunteers are not veterinarians or veterinary technicians, they possess some knowledge in veterinary practice. These volunteers answer emails from fosters around the clock, use their own phones for emergency calls, and text or call me with every case on which they are contacted. We treat over 5,500 animals per year and, because of our limited resources, this "triage" communication system that exists between me and our volunteers is also necessary and critical to handle the volume of questions and concerns that we receive from fosters. This triage system historically has worked well and without incident. In this regard, I have instituted protocols for care of routine illnesses that are common in a shelter environment, to guide our volunteers and staff in their communications with fosters and in their communications with me.[8]

Dr. Jefferson acknowledges that, under this triage system, she diagnosed and ordered treatment for animals she did not personally examine.

## III. THE STATUTORY CONTEXT OF THIS CASE

The VLA is the Board's organic act and is the source of the Board's authority to regulate veterinarians and the practice of veterinary medicine. VLA § 801.251 states, "Except as provided by Section 801.004, a person may not practice, or offer or attempt to practice,

---

[7] Pet. Ex. 21 at 2.

[8] Pet. Ex. 21 at 2-3.

veterinary medicine unless the person holds a license to practice veterinary medicine issued under this chapter."[9]

The VLA authorizes the Board to discipline a veterinary licensee for any of a number of specified reasons, which include, among other conduct, engaging in illegal practices connected with the practice of veterinary medicine[10] and violating one of the Board's rules of professional conduct at title 22, chapter 573 of the Texas Administrative Code.[11] As discussed in more detail below, Staff asserts that the Board may discipline Dr. Jefferson for violating a number of Board rules, violating provisions of the DDA related to the handling of dangerous medications, and committing other acts or omissions specified under the VLA as bases for sanction.

The Board's disciplinary authority, however, is subject to a number of exemptions set out in § 801.004 of the statute. One of those exemptions is at issue here. Dr. Jefferson contends that her conduct at issue in this case falls under the following provision, informally known at the "owner exemption":

> This chapter does not apply to:
>
> > (1) the treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal, unless the ownership, employment, or designation is established with the intent to violate this chapter[.]

This language provides an exemption from the entire VLA. Therefore, the Board has no authority to sanction a veterinarian for the described conduct, even if that conduct is an "illegal

---

[9] "Practice of veterinary medicine" is defined under the VLA as including "the diagnosis, treatment, correction, change, manipulation, relief, or prevention of animal disease, deformity, defect, injury, or other physical condition, including the prescription or administration of a drug, biologic, anesthetic, apparatus, or other therapeutic or diagnostic substance or technique." Tex. Occ. Code § 801.002(5)(A).

[10] Tex. Occ. Code § 801.402(4). *See also* 22 Tex. Admin. Code § 573.4 ("No licensee shall commit any act that is in violation of the laws of the State of Texas, other states, or of the United States, if the act is connected with the licensee's professional practice . . . . A complaint, indictment, or conviction of a law violation is not necessary for the enforcement of this rule. Proof of the commission of the act while in the practice of, or under the guise of the practice of, either veterinary medicine or equine dentistry, is sufficient for action by the Board under this rule.")

[11] Tex. Occ. Code § 801.402(6).

practice" in violation of some other law (unless the other law gives the Board that authority, and no such extra-VLA authority is cited by Staff in this case). To the extent the evidence shows that Dr. Jefferson's alleged acts or omissions come within the owner exemption, she must prevail as a matter of law. Dr. Jefferson argues that her SAPA work fell under the exemption because she acted on behalf of the owner, was the designated caretaker of the owner, and was an employee of the owner.

The DDA requirements that Staff alleges were violated by Dr. Jefferson are in subchapter C of chapter 483 of the Texas Health and Safety Code, which is criminal in nature.[12] If Dr. Jefferson is exempt from Board action for any acts alleged to have violated the DDA, she would remain subject to possible criminal prosecution for any mishandling of prescription medications.[13]

## IV. VIOLATIONS ALLEGED BY STAFF

Staff's Second Amended Notice of Hearing, its live pleading in this case, makes the following allegations of violations:[14]

- Dr. Jefferson diagnosed, and prescribed and dispensed medications for, Starlight (a dog) and Cat A218328 without having examined the animals, in violation of VLA § 801.351, and also dispensed prescription medications to SAPA volunteers prior to the identification of any particular animal for treatment, and therefore in the absence of a

---

[12] A person violating the requirements of § 483.042 commits a Class A misdemeanor.

[13] Likewise, if any of Dr. Jefferson's conduct at issue amounted to animal cruelty, she and/or SAPA would be subject to possible criminal prosecution under chapter 42 of the Texas Penal Code (cruelty to nonlivestock animals) or action by local authorities pursuant to municipal ordinances. *See* Resp. Exs. 61-65. SAPA is also subject to the regulatory jurisdiction of the Texas Department of State Health Services pursuant to chapter 823 of the Texas Health and Safety Code (animal shelters). In addition, SAPA's contract with the City of San Antonio requires that the animals be provided with food, water, shelter, and veterinary care, and the City inspects SAPA's facilities. Resp. Exs. 5, 6; Tr. at 58, 62, 64.

[14] Staff's allegations are lengthy. *See* Second Amended Notice of Hearing at 13-18. The ALJ has attempted to distill the material elements into the bulleted list. The two named animals referenced in Staff's allegations, Starlight and Cat A218328, died.

veterinarian-client-patient relationship, in violation of VLA §§ 801.351[15] and 801.402(13);[16]

- Dr. Jefferson dispensed certain prescription medications for Starlight (Amoxicillin and Tramadol) and other prescription medications (including Baytril and Clavanox) to SAPA volunteers for other animals without proper labeling, in violation of DDA § 483.042;[17]

- Dr. Jefferson failed to follow the proper standard of care, and engaged in a pattern of acts indicating consistent malpractice, negligence, or incompetence, in treating Starlight, Cat A218328, and other animals by diagnosing and treating them without examining them, in violation of VLA 801.402(16)[18] and Board Rule 573.22;[19]

- Dr. Jefferson dispensed prescription medications (Amoxicillin, Tramadol, and Baytril) without proper labeling, in violation of Board Rule 573.40;[20]

- Dr. Jefferson failed to establish a veterinarian-client-patient prior to prescribing, dispensing, delivering, or ordering delivered prescription drugs for Starlight (Amoxicillin and Tramadol) and for other animals (Baytril and Clavamox) and by prescribing, dispensing, delivering, or ordering delivered prescription drugs that were not necessary or

---

[15] Section 801.351 states that a person may not practice veterinary medicine unless a veterinarian-client-patient relationship exists. It further states that such a relationship requires, in part, that the veterinarian possesses sufficient knowledge of the animal to initiate at least a general or preliminary diagnosis of the animal's medical condition. A veterinarian possesses sufficient knowledge of the animal if the veterinarian has recently seen, or is personally acquainted with, the keeping and care of the animal by examining the animal; or making medically appropriate and timely visits to the premises on which the animal is kept. The statute also specifies that a veterinarian-client-patient relationship may not be established solely by telephone or electronic means.

Staff also cites to VLA § 801.353, but this section concerns the confidential relationship between the veterinarian and the veterinarian's client, and the ALJ sees no factual allegations related to this subject matter in Staff's Second Amended Notice of Hearing.

[16] Section 801.402(13) provides that a veterinarian is subject to sanction for ordering a prescription drug or controlled substance for the treatment of an animal without first establishing a veterinarian-client-patient relationship.

[17] DDA § 483.042 establishes the circumstances under which dangerous (prescription, non-controlled) drugs may be properly delivered, including labeling requirements. Failure to comply is a criminal offense.

[18] VLA § 801.402(16) provides that a veterinarian is subject to sanction for committing a pattern of acts that indicate consistent malpractice, negligence, or incompetence in the practice of veterinary medicine.

[19] 22 Tex. Admin. Code § 573.22 ("[Veterinary] [l]icensees shall exercise the same degree of humane care, skill, and diligence in treating patients as are ordinarily used in the same or similar circumstances by average members of the veterinary medical profession in good standing in the locality or community in which they practice, or in similar communities.")

[20] 22 Tex. Admin. Code § 573.40 (requiring particular information on the labels of all medications dispensed by a veterinarian).

required for the medical care of Starlight (Amoxicillin), in violation of Board Rule 573.41;[21]

- Dr. Jefferson failed to keep proper records for Starlight, Cat A218328, and other patients, in violation of Board Rule 573.52;[22] and

- Dr. Jefferson informed the Board that she could not comply with its request for certain information (contact information for several persons) because she did not have it, but she later produced the responsive information, in violation of Board Rule 573.75.[23]

All allegations except for the last one (the one related to compliance with a Board investigation, which dates from 2013) concern events in 2012.

## V. EXEMPTION ANALYSIS

### A.    Dr. Jefferson Has the Burden to Prove Her Acts Were Exempt from the VLA

In an enforcement case such as this, where a regulatory agency seeks to take disciplinary action against a licensee based on alleged violations of the laws governing such licensees, the agency has the burden of proving its allegations by a preponderance of the evidence. However, the licensee in this case seeks to invoke a statutory exemption to the regulatory scheme. The ALJ determines that the burden of proving the applicability of the exemption is on Dr. Jefferson.

SOAH's procedural rules provide that, in determining who bears the burden of proof, the ALJ shall consider the applicable statute, the referring agency's rules, and the referring agency's

---

[21]  22 Tex. Admin. Code § 573.41(establishing that it is unprofessional conduct for a veterinarian to prescribe, administer, dispense, deliver, or order delivered any prescription drug without first having established a veterinarian/client/patient relationship and determined that such prescription drug is therapeutically indicated for the health and/or well-being of the animal(s)).  Staff also contends that the unnecessary prescription of Amoxicillin for Starlight violated VLA § 801.402(12) (providing that a veterinarian is subject to sanction for prescribing unnecessary treatment).

[22]  22 Tex. Admin. Code § 573.52 (setting out requirements for veterinarian patient recordkeeping).

[23]  22 Tex. Admin. Code § 573.75 (providing that a veterinary licensee shall "cooperate fully with any Board inspection or investigation").

policy.[24] The VLA and the Board's rules and policies are silent about the burden of proof as to statutory exemptions. SOAH's rules further provide that, after considering those sources, the judge may consider additional factors. Among those factors are the parties' relative access to and control over information pertinent to the merits of the case and whether a party would be required to prove a negative. The applicability of the exemption at issue relates to Dr. Jefferson's status vis-à-vis SAPA and the animals it rescues—matters about which Dr. Jefferson, and not the Board, has pertinent information. It makes more sense to require Dr. Jefferson to prove that her acts fell within the exemption than it does to require Staff to negate the applicability of the exemption, i.e., to prove a negative. Moreover, claiming an exemption is like raising an affirmative defense, the burden of which to plead and prove is usually on the party urging the defense. For these reasons, the ALJ places the burden of proof on Dr. Jefferson with respect to the exemption issue. And, as there is no reason to deviate from the usual standard of proof applicable in administrative hearings, the ALJ determines that Dr. Jefferson must prove the applicability of the exemption by a preponderance of the evidence.

## B.     Evidence

Dr. Jefferson presented the testimony of the following witnesses:

- Kathy Davis, San Antonio's Director of Animal Care Services;

- Tom Albright, a former board member of Austin Pets Alive! (APA) and a founder and present board member of SAPA; and

- Dr. Jefferson.

Both parties offered documentary evidence, including SAPA corporate and financial materials.

---

[24] 1 Tex. Admin. Code § 155.427.

### C.      The Reason for the Owner Exemption

Dr. Jefferson argues persuasively that the primary concern of the VLA is the protection of animal owners who seek competent veterinary care for their animals.  This argument is borne out by the Board's mission statement:  "The mission of the Texas State Board of Veterinary Medical Examiners is to establish and enforce policies to ensure the best possible quality of veterinary services for the *people* of Texas."[25]  Likewise, the Board's goals are to "ensure that *Texans* are effectively and efficiently served by quality veterinary professionals by setting clear standards for professional conduct, by assuring compliance with the rules of professional conduct and the community standard of care, and seeking solutions to issues that strengthen the profession and *protect the public*."[26]  The owner exemption is understandable in light of the people-oriented nature of the VLA and the Board; client-owners who do not hire outside veterinary care need no protection and may treat their animals as they choose, subject to animal cruelty prohibitions.

### D.      SAPA, as Owner of the Animals, Cared For and Treated Them Through Dr. Jefferson

It is undisputed that SAPA owns the animals it rescues and owned the animals referenced in Staff's Second Amended Notice of Hearing.[27]  SAPA is a nonprofit corporation.[28]

In 2012, Dr. Jefferson, who was already the executive director of APA, founded SAPA (along with Mr. Albright).[29]  During 2012, there were three board members, one of whom was Dr. Jefferson.  Dr. Jefferson was (and continues to be) the executive director of the organization.  In 2012, she was also the only executive staff, and she was in charge of the paid staff members.[30]

---

[25]  Resp. Ex. 20 at 665 (emphasis added).

[26]  Resp. Ex. 20 at 665 (emphasis added).

[27]  Resp. Ex. 70.

[28]  Pet. Exs. 13, 14.

[29]  Resp. Ex. 2; Resp. Ex. 71 at 8-9.

[30]  Tr. at 198.

She authored the care and treatment protocols used by SAPA staff and volunteers.[31] She was the designated representative and signatory of SAPA's tax documents.[32] She was the signatory for the lease of its shelter space.[33]

SAPA's care and treatment of animals it owned were exempt from the VLA. SAPA's mission is to take animals on the euthanasia list maintained by San Antonio Animal Care Services and place them in adoptive homes.[34] This process necessarily involves the care and treatment of the animals. As a nonprofit corporation, SAPA can only effect the treatment and care of its animals through the humans who comprise the corporation. And the acts of a corporate agent on behalf of his or her principal are ordinarily deemed to be the corporation's acts.[35] In 2012, Dr. Jefferson, as founder, executive director, board member, and author of the organization's care and treatment protocols, was more directly associated with the organization than any other person. In her mission-critical functions, her actions were the actions of SAPA. Dr. Jefferson's alleged VLA violations all occurred in the context of SAPA's care of the animals. The ALJ can see no legal or logical reason for concluding that Dr. Jefferson's care and treatment of the animals was somehow distinct from SAPA's care and treatment of the animals. They were one and the same.

Further militating in favor of this interpretation of the exemption is the fact that, in the context of SAPA's work, the VLA's requirement of a veterinarian-client-patient relationship makes no sense. The veterinarian, Dr. Jefferson, founded, directs, operates, and carries out the mission of SAPA. There is no separate client who has hired a veterinarian in an arm's-length transaction and whose interests must be protected by the Board through the VLA. If Dr. Jefferson were regarded as distinct from SAPA for purposes of this analysis, a valid veterinarian-client-patient relationship would require that, as to each animal, the client, which

---

[31] Tr. at 58-9, 199.

[32] Pet. Exs. 13, 15; Resp. Ex. 4.

[33] Resp. Ex. 8.

[34] Resp. Ex. 21 at 1.

[35] *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 545 (Tex. 2003).

would likely be SAPA's sole executive staffer (Dr. Jefferson) or possibly the SAPA board of directors (Dr. Jefferson and two others) would agree to follow the instructions of the veterinarian (Dr. Jefferson).[36] The application of this idea to the context of this case is nonsensical because there is only SAPA, caring for its own animals though its chief agent, Dr. Jefferson.

Finally, Staff's argument that Dr. Jefferson's conduct is not subject to the owner exemption because § 801.004(1) does not specify "owner's agent" is not persuasive. First, there was no need because, as discussed above, the law recognizes that a corporation can only act through humans. Second, the term "designated caretaker" (discussed below) is synonymous in this context with "agent," for what is a designated caretaker of animals but an agent for the care and treatment of animals?

### E.     Dr. Jefferson Was a Designated Caretaker of SAPA's Animals

As noted above, VLA § 801.004(1) also exempts the care and treatment of animals, not just by the owner, but by "a designated caretaker." This term is not defined, and the statute establishes no process for the designation of a caretaker. Staff argues that the phrase cannot refer to Dr. Jefferson because, if it did, it would extend to all veterinarians caring for animals in any capacity other than as direct employees of owners. Part of the difficulty with Staff's argument is that it only asserts Dr. Jefferson was not a designated caretaker of SAPA's animals, and it fails to advance a theory about what the phrase was intended to encompass.

The only logical interpretation for "designated caretaker" is that it means an agent of the owner selected to provide care or treatment of the owner's animal. An agent in this context would not include a veterinarian hired by an owner as an independent contractor in an arm's length transaction. Staff correctly points out that including such fee-for-service veterinarians in the meaning of "designated caretaker" would swallow most of the Board's regulatory authority; that result cannot have been intended by the Legislature. But Dr. Jefferson's care and treatment

---

[36] Tex. Health & Safety Code § 801.351 ("A veterinarian-client-patient relationship exists if the veterinarian: (1) assumes responsibility for medical judgments regarding the health of an animal and a client, who is the owner or other caretaker of the animal, agrees to follow the veterinarian's instructions . . . .")

of SAPA's animals was not as a fee-for-service independent contractor, but rather was an integral part of the inner workings of SAPA. It therefore makes sense to include Dr. Jefferson's SAPA work as falling within the owner exemption. That other individuals (such as SAPA volunteers and fosters actively involved in the care of the animals[37]) might, arguably, also have been caretakers for SAPA's animals does not mean that Dr. Jefferson's actions did not come within the exemption. The statute refers to "*a* designated caretaker,"[38] not "*the* designated caretaker," implying that there could be more than one such caretaker for an animal.[39] Finally, Staff's suggestion that a caretaker designation must occur through a written document is unsupported by any statutory language.[40]

## F.      Dr. Jefferson's Employee Status Was Not Established

Dr. Jefferson asserts that she was SAPA's employee. "Employee" is not defined in this context, but Staff persuasively argues that the ordinary meaning of the word is a person working for someone else for pay.[41] Dr. Jefferson has not established by a preponderance of the evidence that SAPA paid her for her work.

The evidence about Dr. Jefferson's remuneration is conflicting. On the one hand, she testified that, during the time at issue, she was paid for her work as the SAPA executive director by APA at SAPA's request because APA (the older and more established institution) had the administrative machinery to handle the funds.[42] The record includes an undated, handwritten document, signed by Dr. Jefferson and Mr. Albright for SAPA and by a representative of APA,

---

[37] The ALJ is not suggesting that, in the words of Staff, "any person who helps out at SAPA" is exempt from the Act. Petitioner's Closing Brief at 9-10. Rather, the exemption might extend to any person at SAPA who acts as part of the organization's system of triage and animal care.

[38] Emphasis added.

[39] In 2014, SAPA's Board issued a formal, ostensibly retroactive designation of Dr. Jefferson as a caretaker of SAPA's animals, apparently to settle the question of the organization's intent. Resp. Ex. 43. Because the document was issued well after the events at issue in this case, the ALJ gives it little weight.

[40] Staff also argues that Dr. Jefferson did not care for the animals at issue and therefore could not have been their caretaker. But this argument contradicts Staff's contention that Dr. Jefferson treated the animals.

[41] *See* Pet. Ex. 12.

[42] Tr. at 98-99, 144.

stating that SAPA agreed to pay $200,000 to APA for various kinds of administrative support in 2012.[43] Although the agreement reflects a "start date" of January 1, 2012, Mr. Albright testified that the agreement was actually signed in September 2012.[44] The agreement makes no mention of Dr. Jefferson's salary. Dr. Jefferson testified that a $35,000 portion of the $200,000 from SAPA to APA was for her work as the SAPA executive director and that APA then paid that $35,000 to her.[45] Mr. Albright also implied that a portion of the $200,000 went toward Dr. Jefferson's salary.[46] The record further includes an undated invoice from APA to SAPA for a total of $200,000, with $35,000 designated for Executive Director services.[47]

However, there is no corresponding check or other evidence of payment of the $200,000 from SAPA to APA. Nor is there any check or W-2 form reflecting payment to Dr. Jefferson of a salary from SAPA; she testified that the amounts for her SAPA work were included in her W-2 form from APA.[48] Further, SAPA's tax return for 2012 states that SAPA paid no compensation to Dr. Jefferson.[49] Dr. Jefferson testified that this was a mistake.[50]

The evidence on the question of whether Dr. Jefferson was a paid employee of SAPA in 2012 is too contradictory for the ALJ to find that Dr. Jefferson has met her burden of proof on this issue.

---

[43] Resp. Ex. 54 (front).

[44] Resp. Ex. 71 at 40-42.

[45] Tr. at 98.

[46] Resp. Ex. 71 at 8-11.

[47] Resp. Ex. 54 (back). It is unclear whether the two (front and back) pages of Respondent's Exhibit 54 were created as parts of the same document.

[48] Tr. at 199-200.

[49] Pet. Ex. 13.

[50] Tr. at 99-100.

G.    **Ownership or Caretaker Status Was Not Established With Intent to Circumvent VLA**

Staff argues that SAPA's ownership of the dogs and cats at issue, and Dr. Jefferson's agency and caretaker status (if they exist), were established with intent to circumvent the VLA, and the exemption therefore does not apply.[51] Staff suggests that SAPA's triage system is a scheme to circumvent the VLA.

The evidence establishes that the purpose of SAPA's ownership of the animals is to prevent their being euthanized, and the purpose of Dr. Jefferson's designation as a caretaker of the animals is to afford them, through SAPA's triage system, the level of veterinary care SAPA can afford. The owner exemption gives SAPA the freedom to determine what level of veterinary care it will provide to its own animals (subject to state animal cruelty prohibitions, chapter 823 of the Texas Health and Safety Code, municipal ordinances, and SAPA's contractual obligations to the City of San Antonio). Staff's apparently circular argument that anyone operating under the owner exemption is trying to circumvent the VLA would eliminate the exemption. SAPA and Dr. Jefferson took custody of the animals and provided them with care in order to prevent euthanasia, and the fact that SAPA seeks to take advantage of the owner exemption does not change their goal.

Making Staff's position on the circumvention question even more puzzling is a newsletter issued by the Board's Executive Director in 2012 actually stating that animal shelters, once they own the animals in their care, can rely on the owner exemption. The Fall 2012 *Board Notes* states that, after an animal shelter takes ownership, the owner exemption applies:

> After the time period for holding the animal has elapsed, usually three days and set by local ordinance, then the shelter may claim the animal is abandoned and the shelter is the owner. Under Texas law, an animal's owner or a caretaker designated by the owner can perform acts of veterinary medicine on the animal

---

[51] Again, the exemption covers "the treatment or care of an animal in any manner by the owner of the animal, an employee of the owner, or a designated caretaker of the animal, *unless the ownership, employment, or designation is established with the intent to violate this chapter*[.]" Tex. Occ. Code § 801.004(1) (emphasis added).

without involving a veterinarian and without concern for establishing a veterinarian-client-patient relationship, because the owners and caretakers are exempt from the Veterinary Licensing Act.[52]

This statement, made roughly contemporaneously with the events at issue in this case, jibes with Dr. Jefferson's view of the owner exemption and its applicability to shelters. Dr. Jefferson testified that this statement, which she read when it was issued, confirmed her understanding that SAPA's procedures complied with the VLA.[53]

## H. "Care or Treatment of an Animal"—Alleged Failure to Cooperate with Board Investigation and DDA Violations Not Exempt

In order for the owner exemption to apply, the conduct at issue must have constituted "the treatment or care of an animal."[54] One of Staff's allegations is completely unrelated to Dr. Jefferson's treatment of care of an animal: the allegation that Dr. Jefferson failed to cooperate fully with a Board investigation. There is no question that the owner exemption does not apply to this assertion.

Further, a Travis County District Court, in litigation related to this contested case hearing process, determined that the owner exemption does not prohibit the Board from taking enforcement action against Dr. Jefferson based on alleged violations of the DDA in connection with her handling and/or labeling of prescription medications.[55] In making this determination, the Court must have concluded that any alleged failure to handle medications in compliance with the DDA is distinct from the "treatment or care of an animal"; otherwise, the actions would be exempt from the Board's enforcement (provided that the other elements of the exemption are present). Accordingly, litigation of these allegations is necessary.

---

[52] Resp. Ex. 18.

[53] Tr. at 114-16.

[54] Tex. Occ. Code § 801.004(1).

[55] Pet. Ex. 25.

SOAH DOCKET NO. 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                    ORDER NO. 9                    **PAGE 16**

The remainder of the allegations in this case concern conduct by Dr. Jefferson in the context of SAPA's treatment and care of its animals.

## I.    Summary

All of Staff's allegations in this case relate to alleged conduct by Dr. Jefferson that is exempt from the VLA under § 801.004(1), the owner exemption, except for the following allegations that:

- Dr. Jefferson dispensed prescription medications for Starlight (Amoxicillin and Tramadol) and other prescription medications (including Baytril and Clavanox) to SAPA volunteers for other animals without proper labeling, in violation of DDA § 483.042;[56] and

- Dr. Jefferson informed the Board that she could not comply with its request for certain information (contact information for several persons) because she did not have it, but she later produced the responsive information, in violation of Board Rule 573.75.[57]

## VI. REQUIRING THE PARTIES TO CONFER

The parties shall confer and, *no later than March 11, 2015*, submit to the ALJ at least two agreed dates for the resumption of the hearing on the merits.

**SIGNED February 25, 2015.**

SHANNON KILGORE
ADMINISTRATIVE LAW JUDGE
STATE OFFICE OF ADMINISTRATIVE HEARINGS

---

[56] DDA § 483.042 establishes the circumstances under which dangerous (prescription, non-controlled) drugs may be properly delivered, including labeling requirements.

[57] 22 Tex. Admin. Code § 573.75 (providing that a veterinary licensee shall "cooperate fully with any Board inspection or investigation").

# STATE OFFICE OF ADMINISTRATIVE HEARINGS

**AUSTIN OFFICE**
**300 West 15th Street Suite 502**
**Austin, Texas 78701**
**Phone: (512) 475-4993**
**Fax: (512) 322-2061**

## SERVICE LIST

| | |
|---|---|
| **AGENCY:** | **Veterinary Medical Examiners, Texas State Board of (TBVME)** |
| **STYLE/CASE:** | **ELLEN JEFFERSON D.V.M** |
| **SOAH DOCKET NUMBER:** | **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** |
| **REFERRING AGENCY CASE:** | |

| STATE OFFICE OF ADMINISTRATIVE HEARINGS | ADMINISTRATIVE LAW JUDGE ALJ SHANNON KILGORE |
|---|---|
| **REPRESENTATIVE / ADDRESS** | **PARTIES** |
| DAVID F. BROWN EWELL, BROWN & BLANKE, LLP 111 CONGRESS AVENUE, 28TH FLOOR AUSTIN, TX 78701 (512) 457-0233 (PH) (877) 851-6384 (FAX) dbrown@ebblaw.com | ELLEN JEFFERSON, D.V.M. |
| JONATHAN CRABTREE ASSISTANT GENERAL COUNSEL TEXAS BOARD OF VETERINARY MEDICAL EXAMINERS 333 GUADALUPE ST., TOWER III, SUITE 810 AUSTIN, TX 78701 (512) 305-7562 (PH) (512) 305-7574 (FAX) jonathan.crabtree@tbvme.state.tx.us | TEXAS BOARD OF VETERINARY MEDICAL EXAMINERS |